# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### April 3, 2013 Session

## STATE OF TENNESSEE v. COURTNEY BISHOP

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 08-07886      James M. Lammey, Jr., Judge**

---

**No. W2010-01207-SC-R11-CD - Filed March 6, 2014**

---

This appeal involves questions regarding when the police may legally arrest a suspect based on information provided by an accomplice and the amount of corroboration required to convict a person who has confessed to a crime. A Shelby County jury convicted the defendant of attempted aggravated robbery and first-degree felony murder. The Court of Criminal Appeals reversed both convictions after deciding (1) that the defendant's confession should have been suppressed because it was the result of an illegal arrest and detention and (2) that the evidence was insufficient to support either conviction because the State did not introduce sufficient evidence, independent of the defendant's confession, to corroborate the commission of the attempted robbery. *State v. Bishop*, No. W2010-01207-CCA-R3-CD, 2012 WL 938969 (Tenn. Crim. App. Mar. 14, 2012). We have determined that the police had probable cause to arrest the defendant. We have also determined that the defendant's in-court confession did not require corroboration but that, had his extrajudicial confession required corroboration, the State presented ample evidence that this confession was trustworthy. Therefore, we reverse the Court of Criminal Appeals and reinstate the defendant's convictions and sentences.

### Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Reversed

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which GARY R. WADE, C.J., JANICE M. HOLDER, CORNELIA A. CLARK, and SHARON G. LEE, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; Jeffrey D. Zentner, Assistant Attorney General; William L. Gibbons, District Attorney General; Kevin Rardin and Stacy McEndree, Assistant District Attorneys General, for the appellant, State of Tennessee.

R. Todd Mosley (on appeal); and Robert Parris (at trial), Memphis, Tennessee, for the appellee, Courtney Bishop.

**OPINION**

**I.**

On the evening of August 19, 2008, Marlon McKay and Courtney Bishop were sitting in a silver 1997 Mercury Cougar with tinted windows owned by Mr. McKay's girlfriend. Mr. McKay was a marijuana dealer. On this particular evening, he was carrying his girlfriend's cellular telephone and a chrome, five-shot Torus .44 magnum revolver. The night air was drizzling and damp.

Prior to that night, Mr. McKay had tried to sell a pound of marijuana to Maurice Taylor, another marijuana dealer, at a house on Cella Street where Mr. Taylor was living. Mr. Taylor declined to purchase the marijuana on that occasion because he considered it to be of inferior quality. This unsuccessful transaction gave Mr. McKay the idea to rob Mr. Taylor.

As they were sitting in the automobile, Mr. McKay explained his plan to Mr. Bishop. Mr. McKay said he would convince Mr. Taylor to meet with them by offering to sell him one pound of high quality marijuana. He told Mr. Bishop that Mr. Taylor had been robbed before, that he would be easy to rob, and that Mr. Taylor would have a wallet full of cash when he met with them. At that point, Mr. McKay passed the revolver to Mr. Bishop and then drove in the direction of Cella Street.

On that evening, Calvin McKissack, who lived on Cella Street, noticed an unfamiliar light-colored Mercury Cougar with tinted windows circling the block. Another resident of Cella Street, Brooke Howard, also observed a light-colored automobile circling the block. At one point, when the automobile stopped in front of his house, Mr. McKissack observed two African-American males in the automobile.

Meanwhile, Mareo Taylor, Maurice Taylor's older brother, was watching television with his girlfriend at the duplex on Cella Street where he and his brother were living. After receiving a telephone call at approximately 11:00 p.m., Maurice Taylor left the duplex without saying a word to his brother, locking the security door behind him as he left. Almost immediately, Mareo Taylor heard his brother call his name and then heard a gunshot. Other residents of Cella Street, including Brooke Howard and Melvin Riley, also heard the gunshot. Mr. Riley looked out of his window in time to see two African-American males run down the street, get into a light-colored automobile with tinted windows, and drive away.

-2-

Mareo Taylor rushed outside after he heard the gunshot and discovered his brother lying on his back in the yard. Maurice Taylor was in shock, and Mareo Taylor tried to revive him while his girlfriend telephoned for help. The neighbors gathered in the street to find out what was going on, and the police and paramedics arrived in minutes. Maurice Taylor was already dead from a single gunshot wound in his chest.[1]

Crime scene investigators found small plastic bags lying on the ground near Maurice Taylor's body. His wallet contained $1,163.75 in cash. A search of the yard uncovered no bullet casings or other helpful evidence. Throughout the night and the following morning, the police interviewed the neighbors, and several neighbors described the light-colored sedan with tinted windows that had been circling in the neighborhood at the time of the shooting. The police also obtained information from Maurice Taylor's cellular telephone that led them to Mr. McKay's girlfriend and her silver 1997 Mercury Cougar. The police found and arrested Mr. McKay.

Mr. McKay initially declined to give a statement. Later, the police told him they obtained information from his girlfriend's cellular telephone records which revealed that Mr. McKay's final call to Maurice Taylor was made a short distance from Mr. Taylor's house. Confronted with this information, Mr. McKay confessed. In a written statement signed by Mr. McKay at 4:53 p.m. on August 22, 2008, Mr. McKay described the shooting as follows:

> I was riding down Brower and I seen Courtney. He was standing outside and I had stopped to pick him up. . . . Maurice called about 30 minutes after Courtney got in the car. That's when we decided to try and take Maurice's money. . . . [W]e both needed some money. . . . . I parked the car for a minute. We jumped out and we walked down Cella Street for a minute. . . . I got cold feet and . . . [started w]alking back to the car . . . . That's when I guess Maurice came out of the house and I heard a shot. Courtney came running . . . he said he shot him in the leg. . . . The next day, I seen the news and they said Maurice was dead.

While Mr. McKay did not know "Courtney's" last name, he identified Mr. Bishop from a photo lineup. The officers who took Mr. McKay's confession telephoned the case coordinator, Lt. Bart Ragland. Lt. Ragland then ordered another officer to arrest Mr. Bishop.

The police took Mr. Bishop into custody at his home on the evening of August 22, 2008. They drove him to the Memphis Criminal Justice Center. After they arrived, the

---

[1]The medical examiners later discovered a high-caliber bullet lodged in Maurice Taylor's back.

police contacted a magistrate and obtained a "48 hour hold" authorization – a procedure that involves a finding of probable cause to arrest, along with an assumption that if a suspect's alibi checks out, the suspect will be released within 48 hours.

On August 23, 2008, during his second day in custody, Mr. Bishop admitted his involvement in Maurice Taylor's killing. Just as Mr. McKay had done, Mr. Bishop answered the officer's questions while a typist transcribed the dialogue. Mr. Bishop described the pistol and the automobile and explained that Mr. McKay was using his girlfriend's cellphone. He said he went with Mr. McKay to Maurice Taylor's house "to rob him of his money." He explained:

> When [Mr. McKay saw me at my girlfriend's] house he told me he had a lick for me and I said ok. . . . We rode around to see how it was to go . . . he called Maurice to buy the pound of weed, and I was standing on the side of his car. I pulled a gun out and [Maurice saw] me pull it out and he was tussling with me. He made my fingers slip and pull the trigger making the gun go off, and we ran to [the] car and I gave the gun back to [Mr. McKay, who] said he was going to ditch the gun. He drop[ped] me off . . . and I went home.

On December 12, 2008, a Shelby County grand jury indicted Mr. Bishop for first-degree felony murder and attempted aggravated robbery.[2]

On September 18, 2009, Mr. Bishop moved to suppress his August 23, 2008 confession. Among other grounds, Mr. Bishop asserted that his statement should be suppressed because it was the fruit of his illegal arrest. Mr. Bishop argued that his arrest was illegal because Mr. McKay's statements implicating him in the shooting of Maurice Taylor did not provide the police with probable cause to arrest him.

The trial court conducted a hearing on Mr. Bishop's motion to suppress on October 9 and November 10, 2009. Both Mr. Bishop and Lt. Ragland testified under oath. Mr. Bishop confirmed the essential facts of his confession. He described the plan to rob Maurice Taylor and the shooting that ensued.

Lt. Ragland testified that he was responsible for aggregating all the evidence regarding the murder of Maurice Taylor collected by the twelve investigators working on the

---

[2]In a separate trial, a jury found Mr. McKay guilty of first-degree felony murder and attempted aggravated robbery. *See State v. McKay*, No. W2010-01785-CCA-MR3-CD, 2011 WL 5335285 (Tenn. Crim. App. Nov. 4, 2011), *perm. app. denied* (Tenn. Apr. 12, 2012).

case. He testified that within twenty-four hours after the shooting, the police had obtained Maurice Taylor's phone records and had interviewed all the witnesses, including a witness who saw two African-American males running to the getaway car.

Lt. Ragland also explained how almost every detail of Mr. McKay's confession matched information that the police had already collected. For example, the police had a description of the getaway car and suspected that the murder weapon was a revolver because they had been unable to find a shell casing, despite searching the crime scene with a metal detector for over two hours. In addition, Lt. Ragland testified that Mr. McKay's confession was "believable" because Mr. McKay was admitting to participating in a terrible crime and appeared to show genuine remorse about what had occurred.

On November 13, 2009, the trial court filed an order denying Mr. Bishop's motion to suppress. Applying the two-prong *Aguilar-Spinelli*[3] test, the trial court found that Mr. McKay had a strong basis of knowledge for the information he provided the police on August 22, 2008, and that his statement identifying Mr. Bishop as the trigger-man was credible. The trial court explained:

> [Mr. McKay] implicates himself and his statement describes in detail the means, motive, and opportunity to commit the crime and the scene of the crime. Much of [Mr. McKay's] statement describing a scheme for the sale of drugs in order to set up the victim for robbery is corroborated by other witnesses. In particular[, Mr. McKay] mentions an accomplice thereby corroborating eyewitness accounts of seeing two individuals fleeing the scene and a witness who thought there may have been someone else in [Mr. McKay's] automobile seen in the area of the crime. It is reasonable to believe that a prudent man, armed with the information known at the time of [Mr. Bishop's] arrest, would have effectuated the arrest.

Mr. Bishop's trial was held from April 12 to April 16, 2010. Mr. Bishop testified on his own behalf at the trial and again recounted the same story he had told police during the suppression hearing – that he accidentally shot Maurice Taylor during a botched robbery attempt. On April 16, 2010, the jury convicted Mr. Bishop of attempted aggravated robbery and first-degree felony murder in perpetration of an attempted aggravated robbery. On May 17, 2010, the trial court sentenced Mr. Bishop to consecutive sentences of life for the first-

---

[3] *See Spinelli v. United States*, 393 U.S. 410, 415 (1969); *Aguilar v. Texas*, 378 U.S. 108, 114 (1964).

degree murder conviction and three years for the attempted aggravated robbery conviction. The trial court later denied Mr. Bishop's motion for a new trial.

Mr. Bishop appealed. On March 14, 2012, the Court of Criminal Appeals reversed Mr. Bishop's convictions for felony murder and attempted aggravated robbery. The appellate court concluded that the trial court erred by denying Mr. Bishop's motion to suppress his pretrial statement to the police. *State v. Bishop*, No. W2010-01207-CCA-R3-CD, 2012 WL 938969 (Tenn. Crim. App. Mar. 14, 2012). The Court also held that the State had failed to prove the *corpus delicti* of aggravated robbery because the only evidence introduced at trial that Mr. Bishop attempted to rob Maurice Taylor was his own uncorroborated confession. Accordingly, the Court of Criminal Appeals dismissed Mr. Bishop's attempted aggravated robbery conviction and remanded the case for a new trial on the modified charge of second degree murder. *State v. Bishop*, 2012 WL 938969, at *1.

We granted the State's application for permission to appeal and now reverse the Court of Criminal Appeals and reinstate Mr. Bishop's convictions for two reasons. First, we find that the police had probable cause to arrest Mr. Bishop. Second, we find that Mr. Bishop's extrajudicial confession did not require corroboration because he repeated his confession under oath at trial. Had Mr. Bishop's extrajudicial confession required corroboration, we have determined, using the modified trustworthiness standard, that the record contains ample evidence that Mr. Bishop's extrajudicial confession was trustworthy.

## II.
### PROBABLE CAUSE FOR THE WARRANTLESS ARREST OF MR. BISHOP

The State insists that the Court of Criminal Appeals erred when it decided that the police lacked probable cause to arrest Mr. Bishop without a warrant because Mr. McKay's confession implicating Mr. Bishop lacked sufficient corroboration. The State argues that Mr. McKay's statement alone was sufficient to establish probable cause to arrest Mr. Bishop. The State also argues, in the alternative, that the record reflects that the police had sufficient independent information to corroborate Mr. McKay's statement. While we disagree with the State's first argument, we agree with its second.

### A.

We have frequently articulated the standard of review for suppression hearings. Recently we stated:

> [T]he standard of review applicable to suppression issues is well established. When the trial court makes findings of fact at the conclusion of a suppression hearing, they are binding upon this

-6-

Court unless the evidence in the record preponderates against them. Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. *The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence* adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence.

Our review of a trial court's application of law to the facts is de novo with no presumption of correctness. Further, when evaluating the correctness of the ruling by the trial court on a motion to suppress, appellate courts may consider the entire record, including not only the proof offered at the hearing, but also the evidence adduced at trial.

*State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012) (emphasis added) (citations omitted). In this case, the State prevailed at the suppression hearing, so we afford the State the strongest legitimate view of the evidence.

**B.**

We begin our analysis with the observation that Mr. Bishop was clearly arrested on August 22, 2008, when police removed him from his home in handcuffs. An "arrest" is defined as the taking, seizing, or detaining of a person, either by physical contact or by any act that indicates the officer intends to take the person into custody or put the person under the officer's control. *State v. Echols*, 382 S.W.3d at 278; 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 5.1(a), at 11-14 (5th ed. 2012) ("LaFave"). Whether an arrest has occurred must be determined objectively from the arrestee's perspective. The question is whether a reasonable, innocent person in the arrestee's position objectively believes that he or she has been detained under the control of law enforcement. *State v. Echols*, 382 S.W.3d at 278; 3 LaFave § 5.1(a), at 3-4.

A person may be placed under arrest without formalities such as a booking at the police station or a declaration by the officer that the person is under arrest. However, an arrest is more severe than other types of "seizures" that are regulated under the Fourth Amendment and Tenn. Const. art. 1, § 7. *See State v. Daniel*, 12 S.W.3d 420, 424-25 (Tenn. 2000). Police effect a "seizure" in cases where a reasonable, innocent person would not feel free to leave. An arrest additionally requires that there be "actual restraint on the arrestee's freedom of movement under legal authority of the arresting officer." *State v. Echols*, 382 S.W.3d at 278 (quoting *State v. Crutcher*, 989 S.W.2d 295, 301-02 (Tenn. 1999)). Mr.

-7-

Bishop was clearly arrested. The next question is whether that warrantless arrest was reasonable under the state and federal constitutions.

Both the Fourth Amendment to the United States Constitution[4] and Article I, Section 7 of the Constitution of Tennessee[5] protect individuals against unreasonable searches and seizures. Based on these provisions, the courts will presume that a warrantless arrest is unreasonable unless the State can demonstrate that the arrest conformed to one of the recognized exceptions to the warrant requirement. *State v. Bartram*, 925 S.W.2d 227, 229-30 (Tenn. 1996). One of these recognized exceptions is codified at Tenn. Code Ann. § 40-7-103(a)(3) (2012), which authorizes a warrantless arrest when "a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested has committed the felony."[6] Thus, the question before us in this case is whether the police had probable cause to link Mr. Bishop to the killing of Maurice Taylor.

Probable cause exists when "at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense." *State v. Echols*, 382 S.W.3d at 277-78 (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)) (alterations and internal quotation marks omitted). It requires "more than a mere suspicion." *State v. Lawrence*, 154 S.W.3d 71, 76 (Tenn. 2005). Instead, a probable cause inquiry focuses on probabilities rather than technicalities and is grounded in the factual and practical considerations of everyday life on which reasonable and prudent people, not legal technicians, act. *State v. Melson*, 638 S.W.2d 342, 351 (Tenn. 1982) (quoting *Draper v. United States*, 358 U.S. 307, 313 (1959)).

---

[4]The Fourth Amendment states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[5]Tenn. Const. art. I, § 7 states:

That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

[6]We have previously held that "reasonable cause" is synonymous with "probable cause." *State v. Echols*, 382 S.W.3d at 278. For the purpose of this opinion, we will use the term "probable cause."

The United States Supreme Court has noted that "[t]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *Brinegar v. United States*, 338 U.S. 160, 175 (1949) (internal quotation marks omitted). We long ago explained that

> [a] narrow construction [of the probable cause standard embedded in Tenn. Code Ann. § 40-7-103(a)(3)] would open the way for the escape of desperate criminals and the defeat of justice. One too liberal would lead to the harassment of the innocent. But the officer may not be required to wait for assurance, for evidence which would convict; when circumstances fairly point to a felony it is his duty to act, and act promptly.

*Dittberner v. State*, 155 Tenn. 102, 106, 291 S.W. 839, 840 (1927).

When determining whether the police possessed probable cause, the courts should consider the collective knowledge that law enforcement possessed at the time of the arrest, provided that a sufficient nexus of communication existed between the arresting officer and any other officer or officers who possessed relevant information. Such a nexus exists when the officers are relaying information or when one officer directs another officer to act. *State v. Echols*, 382 S.W.3d at 278; 2 LaFave § 3.5(a)-(c). It matters not whether the arresting officers themselves believed that probable cause existed. *State v. Huddleston*, 924 S.W.2d 666, 676 (Tenn. 1996) ("[An officer's] subjective belief that he did not have enough evidence to obtain a warrant is irrelevant to whether or not probable cause actually existed."). When determining the existence of probable cause, the courts should also consider the entire record, including the proof adduced at both the suppression hearing and the trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

### C.

We agree with the trial court and the Court of Criminal Appeals that Mr. Bishop was arrested when the police handcuffed him, removed him from his home, placed him in a squad car, and drove him to the homicide office where he was interviewed while shackled to a bench. However, we respectfully disagree with the conclusion of the Court of Criminal Appeals that the police lacked probable cause when they arrested Mr. Bishop.

### 1.

Maurice Taylor was shot and killed around 11:00 p.m. on August 19, 2008. The investigation began within minutes of the shooting. By the next morning, the police had interviewed the persons living in the area and had been told that a light-colored automobile

with tinted windows resembling a Mercury Cougar had been observed circling the block before the shooting. Witnesses also reported that two African-American males were in the automobile and that two African-American males were seen running from the scene of the shooting to the automobile.

By the morning of August 20, 2008, the examination of Maurice Taylor's body and the investigation of the scene of the shooting indicated that Maurice Taylor had been killed by one large caliber bullet, and the police suspected that the bullet had been fired from a revolver because no shell casing had been discovered, despite a diligent search of the scene with a metal detector. In addition, the police had learned from examining Maurice Taylor's cellular telephone that he had received a telephone call before the shooting from a cellular phone owned by Mr. McKay's girlfriend.

The uncontradicted testimony of Lt. Ragland, the case coordinator, at the suppression hearing confirmed that the police knew all these facts on the afternoon of August 22, 2008, when Mr. McKay gave his statement implicating himself and Mr. Bishop. In his statement to the police, Mr. McKay admitted that he had made the telephone call to Maurice Taylor using his girlfriend's cellular telephone and that he was driving his girlfriend's light gray Mercury Cougar. He also identified the murder weapon as a .44 magnum revolver. In addition, Mr. McKay stated that he lured Maurice Taylor out of his house by offering to sell him a pound of marijuana. The police knew that Maurice Taylor was a drug dealer and that his wallet found at the scene of the shooting contained over $1,000 – an amount sufficient to purchase one pound of marijuana.

The only consequential fact contained in Mr. McKay's statement for which police had no corroboration was the identity of the other African-American male who accompanied Mr. McKay on the night of August 19, 2008 and who was with Mr. McKay at the scene of the shooting. Mr. McKay identified that person as his friend, "Courtney," and identified Mr. Bishop as "Courtney" in a photo lineup. Based on Mr. McKay's identification of Mr. Bishop, Lt. Ragland directed another officer to find and arrest Mr. Bishop.

**2.**

Mr. McKay's August 22, 2008 confession implicated both him and Mr. Bishop. The question we must decide is whether Mr. McKay's identification of Mr. Bishop as his accomplice and the person who fatally shot Maurice Taylor gave the police probable cause to arrest Mr. Bishop. We find that it did.

While this question is straightforward, the analysis required to answer the question is not. Because the information that triggered Mr. Bishop's arrest was derived solely from the statement of an informant – Mr. McKay – the trustworthiness of that statement is subject to

-10-

doubt. Accordingly, we must determine whether Mr. McKay's identification of Mr. Bishop should be treated as presumptively reliable. If it is not presumptively reliable, we must decide whether Mr. McKay's statement was shown to be reliable by independent evidence.

We have long held that information provided by a citizen-informant carries a presumption of reliability. Stated another way, if the source of the information is a person (1) who is known to the police, (2) who is not part of the "criminal milieu," and (3) whose motivation is to aid the police without any expectation of remuneration, then the information is deemed reliable and is sufficient to provide probable cause for arrest. *State v. Melson*, 638 S.W.2d at 354-56.

On the other hand, when the information is provided (1) by a professional informant who gives tips for money or favors, (2) by a person from the "criminal milieu" who may have an ax to grind, or (3) by an anonymous informant, the information is presumptively suspect, and the State must establish its credibility. *See State v. Williams*, 193 S.W.3d 502, 507-08 (Tenn. 2006); *State v. Carter*, 160 S.W.3d 526, 534 (Tenn. 2005). To do this, we explained in *State v. Jacumin* that the State must satisfy the two-pronged *Aguilar-Spinelli* test. *State v. Jacumin*, 778 S.W.2d 430, 436 (Tenn. 1989).

When applying the *Aguilar-Spinelli* test, a statement from a professional, "criminal milieu," or an anonymous informant can provide probable cause only if the State demonstrates a strong "basis of [the informant's] knowledge" and the "veracity" of the information. The "basis of knowledge" prong involves how the informant came to know the information he or she claims to know. The "veracity" prong requires facts that demonstrate either that the informant is personally credible or that the information itself is reliable. The credibility of the informant's information may also be buttressed by independent corroboration of its details. However, it is not necessary to corroborate every detail of the informant's information, *State v. Jacumin*, 778 S.W.2d at 432, 436, or to "directly link the suspect to the commission of the crime." Corroboration of "only innocent aspects of the story" may suffice. *State v. Melson*, 638 S.W.2d at 355 (quoting *United States v. Rollins*, 522 F.2d 160, 164-65 (2d Cir. 1975)); *see also State v. Smotherman*, 201 S.W.3d 657, 664 (Tenn. 2006).

In *State v. Jacumin*, we cautioned against "excessively technical" applications of the *Aguilar-Spinelli* test because the test is intended to be a guide, rather than a set of "inflexible, independent requirements in every case." *State v. Jacumin*, 778 S.W.2d at 433 (quoting *Illinois v. Gates*, 462 U.S. 213, 230-31 n.6 (1989)). We recognized that magistrates and law enforcement officers making probable cause determinations are "practical people" striving to formulate "common-sense conclusions about human behavior." *State v. Jacumin*, 778 S.W.2d at 432 (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). As the Court of Criminal Appeals has noted, "judicial application of constitutional standards, or any legal

standard, in [a] hypertechnical fashion tends to demean our system of justice and to weaken society's confidence in it." *State v. Moon*, 841 S.W.2d 336, 342 (Tenn. Crim. App. 1992).

We have never addressed directly whether the statements of a person who confesses to a crime and implicates another in the process should be considered presumptively reliable. The Court of Criminal Appeals has determined that such a confession should not be considered to be presumptively reliable. *See State v. Lewis*, 36 S.W.3d 88, 99 (Tenn. Crim. App. 2000) (holding that a "*Jacumin* analysis is necessary" when the informant is the defendant's accomplice). We agree with this conclusion.

There are two sides of the coin when an informant's confession implicates another person. On one hand, some courts, analogizing the issue to the admissibility of an unavailable declarant's statement against interest, treat accomplice identifications as presumptively reliable. In *United States v. Harris*, for example, the United States Supreme Court upheld a search warrant that relied on evidence provided by an informant who admitted purchasing illegal whiskey from the defendant. A plurality of the United States Supreme Court found that

> [c]ommon sense in the important daily affairs of life would induce a prudent and disinterested observer to credit [statements against penal interest]. People do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions. Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility – sufficient at least to support a finding of probable cause to search.

*United States v. Harris*, 403 U.S. 573, 583 (1971). Several panels of the Court of Criminal Appeals have agreed with the plurality's conclusion on this point. *See, e.g.*, *State v. Marney*, No. W2002-02648-CCA-R3-CD, 2003 WL 23100338, at *4 (Tenn. Crim. App. Dec. 31, 2003) (finding that the "reliability or veracity of the informant may be suggested when the informant's statement is contrary to his penal interest," provided that the statement relates to "the criminal activity, the targeted premises[,] or the defendant") (internal quotations omitted) (No Tenn. R. App. P. 11 application filed); *State v. Bexley*, No. 87-83-III, 1988 WL 10048, at *9 (Tenn. Crim. App. Feb. 11, 1988) ("[A]dmissions of a crime carry their own indicia of credibility – sufficient at least to support a finding of probable cause."), *perm. app. denied* (Tenn. Dec. 12, 1988).

Other judges have been less sanguine about the reliability of self-inculpatory statements by informants. In *United States v. Harris*, Justice Harlan, joined by three other justices, argued that the Court's "analogy to the hearsay exception is quite tenuous" and that

the "basic thrust" of the *Aguilar-Spinelli* line of cases was "to prohibit the issuance of warrants upon mere uncorroborated hearsay," especially because an informant might expect to receive lenient treatment in exchange for naming the defendant in his or her confession. *United States v. Harris*, 403 U.S. at 594-95 (Harlan, J., dissenting); *see also State v. Marney*, 2003 WL 23100338, at *5 (cataloguing the ways in which a confession that also names someone else may be "an effective bargaining tool" that promotes the informant's own interest).

Further undermining the reliability of a self-implicating statement is the fact that the statement itself places the speaker within the "criminal milieu." *See State v. Echols*, 382 S.W.3d at 279 (quoting *State v. Lewis*, 36 S.W.3d at 98). When a person like Mr. McKay, after being caught red-handed, confesses to an attempted robbery of a fellow drug dealer, the very acts to which he is confessing place a question mark over both the person's character and the person's veracity. *See State v. Moon*, 841 S.W.2d at 339-40 (noting that "[g]enerally, one could infer that a person who has committed a crime may be less honest or less worthy of belief than a person who has not").

In addition, a person confessing to the police could very well be motivated to falsely spread the blame to someone else. It is not difficult to imagine the scenario in which Mr. McKay was actually the triggerman but decided to implicate Mr. Bishop in hopes of reducing his punishment. Although much of Mr. McKay's statement was self-inculpatory, the parts concerning Mr. Bishop were not. *See Williamson v. United States*, 512 U.S. 594, 599 (1994) (noting that "[t]he fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts"); *State v. Dotson*, 254 S.W.3d 378, 393 (Tenn. 2008) (noting that "mere proximity" to self-inculpatory statements does not make a self-exculpatory statement more reliable).

We are aware that many courts, including most federal courts, deem an accomplice's confession sufficient for a finding of probable cause regardless of whether the confession is corroborated by other evidence.[7] However, in *State v. Jacumin*, we explicitly unhitched our treatment of informants from that of the federal courts and embraced a more aporetic approach. We agreed with other jurists who had described the federal standard for assessing the reliability of informants as "unacceptably shapeless and permissive" and "nebulous" and approved the idea that "no matter how reliable or unquestionably honest an informant might

---

[7]*See, e.g.*, *United States v. Leppert*, 408 F.3d 1039, 1042 (8th Cir. 2005); *United States v. Brown*, 366 F.3d 456, 459-60 (7th Cir. 2004) (citing *United States v. Patterson*, 150 F.3d 382, 386 (4th Cir. 1998)); *United States v. Soriano*, 361 F.3d 494, 505-06 (9th Cir. 2003); *Craig v. Singletary*, 127 F.3d 1030, 1044-45 (11th Cir. 1997) (en banc); *see also State v. Valenzuela*, No. 2 CA-CR 2008-0398, 2010 WL 626694, at *7 & n.13 (Ariz. Ct. App. Feb. 23, 2010) (collecting cases and describing this as the majority view), *perm. app. denied* (Ariz. Jan. 4, 2011); *State v. Purvey*, 740 A.2d 54, 62 (Md. Ct. Spec. App. 1999).

-13-

be, there must be some showing of supporting facts." *State v. Jacumin*, 778 S.W.2d at 434-36; *see also* 2 LaFave § 3.4(a), at 265. Therefore, we find that the *Aguilar-Spinelli* test provides an appropriate lens for determining whether the self-inculpatory statement of one suspect may give police probable cause to arrest a person the suspect identifies as his or her accomplice.

**3.**

Applying the *Aguilar-Spinelli* test to the case at hand, we easily conclude that Mr. McKay possessed a strong "basis of knowledge" for identifying Mr. Bishop as his accomplice. He was, after all, admittedly at the crime scene when Maurice Taylor was shot. The second prong, the apparent "veracity" of this information, is where we part ways with the court below. Affording the State the strongest legitimate view of the evidence, we find that Mr. McKay's identification of Mr. Bishop was suitably credible to endow the police with probable cause to arrest Mr. Bishop.

Although Mr. McKay's credibility is questionable, Mr. McKay's statement itself was believable, not just because it was self-inculpatory, but also because almost every detail in Mr. McKay's statement, except the identity of Mr. Bishop, was corroborated by facts that the police had already gathered. Lt. Ragland testified at the suppression hearing that he was the officer who received all the information in the Maurice Taylor shooting and that he was updating his case constantly. He testified that Mr. McKay's account of the killing matched Mareo Taylor's account of the shooting, including the facts that his brother received a telephone call before he went outside and that one shot was fired. Mr. McKay's description of the pistol was consistent with the police's suspicion that the murder weapon was a large-caliber revolver.

The records of Maurice Taylor's cellular telephone confirmed Mr. McKay's statements regarding his telephone call to Maurice Taylor. In addition, the police already knew that Maurice Taylor had been robbed previously and that he did not carry a gun – details that both Mr. McKay and Mr. Bishop later repeated in their confessions. Maurice Taylor had baggies and over $1,000 on his person when he was shot, which corroborated Mr. McKay's statement to the police that Maurice Taylor was a drug dealer. Other witnesses had also told the police that Mr. McKay and Maurice Taylor both sold marijuana.

In addition, the Mercury Cougar owned by Mr. McKay's girlfriend, which Mr. McKay admitted driving on the night of the shooting, matched the witnesses' accounts of the automobile being driven by the two African-American males who were seen running from the scene of the crime. Finally, and most importantly, the witnesses had told the police that two African-American males had been involved in the shooting. Before Mr. McKay

confessed on August 22, 2008, the only information that the police lacked was the identity of the second man who was with Mr. McKay.

By the time Mr. McKay gave his statement, the police had assembled most of the puzzle themselves. Mr. McKay simply provided them the final piece – the identification of Mr. Bishop as the second person involved in the attempted robbery and shooting of Maurice Taylor. Lt. Ragland also testified that Mr. McKay's credibility was enhanced because he appeared to be genuinely remorseful about the crime.

We have already noted that corroboration of every detail of an informant's information is not required. *State v. Jacumin*, 778 S.W.2d at 436; *see also United States v. Bush*, 647 F.2d 357, 363 (6th Cir. 1981). Based on this record, we have no hesitation in concluding that a reasonably prudent person would have believed Mr. McKay when he identified Mr. Bishop as the person who was with him at the scene of the attempted robbery and shooting of Maurice Taylor. We continue to stress that the strength of the evidence necessary to establish probable cause to arrest is significantly less than the strength of evidence necessary to find a defendant guilty beyond a reasonable doubt. But, because Mr. McKay's identification of Mr. Bishop provided the police with probable cause to arrest Mr. Bishop, the arrest of Mr. Bishop without a warrant was not illegal.

### III.
### THE LEGALITY OF MR. BISHOP'S DETENTION

Mr. Bishop also insists that his confession should have been suppressed because his "arrest was for an illegal purpose." He relies on the conclusion of the Court of Criminal Appeals that his detention was the result of a "rankly unconstitutional 48-hour hold" that was "the product of a police department policy . . . condemned by this court repeatedly in the past." *State v. Bishop*, 2012 WL 938969, at *11. Mr. Bishop argues that whether or not the police possessed probable cause to arrest him, they did not believe they had probable cause, which shows that his arrest was an "investigatory detention" that violates the Fourth Amendment, as interpreted and applied in *Gerstein v. Pugh*, 420 U.S. 103 (1975), and *State v. Huddleston*, 924 S.W.2d 666 (Tenn. 1996).

### A.

When a person is arrested without a warrant, the law requires the arresting authorities to take him or her before a magistrate to "seek a prompt judicial determination of probable cause." *Gerstein v. Pugh*, 420 U.S. at 125; *State v. Huddleston*, 924 S.W.2d at 668; *see also* Tenn. R. Crim. P. 5(a)(1) (stating that "[a]ny person arrested – except upon a capias pursuant to an indictment or presentment – shall be taken without unnecessary delay before the nearest

appropriate magistrate"). In Tennessee, these "*Gerstein* hearings" also typically include an assessment of pretrial bail. *State v. Huddleston*, 924 S.W.2d at 672 n.2.

While a delay of less than forty-eight hours is presumptively reasonable, a delay beyond forty-eight hours requires the State to prove that "a bona fide emergency or other extraordinary circumstance" caused the delay. *County of Riverside v. McLaughlin*, 500 U.S. 44, 56-57 (1991). Even so, a delay shorter than forty-eight hours may still be considered unreasonable, and hence unconstitutional, if the delay is "for the purpose of gathering additional evidence to justify the arrest" or if the delay is "motivated by ill will against the arrested individual, or delay for delay's sake." *County of Riverside v. McLaughlin*, 500 U.S. at 56.

In *Huddleston*, this Court determined that "the exclusionary rule should apply when a police officer fails to bring an arrestee before a magistrate within the [48 hours] allowed by *McLaughlin*." *State v. Huddleston*, 924 S.W.2d at 673. Thus, under the "fruit of the poisonous tree" doctrine, this Court held that any evidence obtained by virtue of a suspect's unlawful detention must be excluded from trial unless the arrested person's statement was "sufficiently an act of free will to purge the primary taint" of the illegal detention. *State v. Huddleston*, 924 S.W.2d at 674-75 (quoting *Brown v. Illinois*, 422 U.S. 590, 598 (1975)).

We also explained in *Huddleston* that when a suspect is arrested based on probable cause, the ensuing detention is typically not illegal until it "ripens" into a *Gerstein* violation. *State v. Huddleston*, 924 S.W.2d at 675 ("Initially, detention is not illegal, but later ripens into a constitutional violation."). "Obviously," we noted, "if the [arrestee's] statement was given prior to the time the detention ripened into a constitutional violation, it is not the product of the illegality and should not be suppressed." *State v. Huddleston*, 924 S.W.2d at 675.

**B.**

While Mr. Bishop has consistently and repeatedly asserted that his arrest was illegal, at no time during the proceedings in the trial court did he specifically take issue with the alleged delay in providing him a *Gerstein* hearing. Even though Mr. Bishop did not raise a *Gerstein* issue in his motion for a new trial or in his appellate brief, the Court of Criminal Appeals decided to address the issue on its own motion without requesting either supplemental briefing or additional argument by the parties. The State did not include the *Gerstein* issue in its Tenn. R. App. P. 11 application for permission to appeal, nor did it address the issue in the brief filed in this Court. Mr. Bishop likewise did not include the *Gerstein* issue in his response to the State's Tenn. R. App. P. 11 application. However, Mr.

Bishop's brief filed in this Court contained a *Gerstein* argument as one of three bases for finding that his arrest was illegal.[8]

Except for several well-defined exceptions not applicable in this case, parties desiring to raise an issue on appeal must properly preserve that issue both in the trial court and on appeal. *State v. Bledsoe*, 226 S.W.3d 349, 353 (Tenn. 2007). Accordingly, the issue must be (1) properly raised or presented to the trial court, (2) properly presented to the intermediate appellate court in cases which cannot be appealed directly to this Court, and (3) properly raised in the Tenn. R. App. P. 11 application for permission to appeal or in the answer to the Tenn. R. App. P. 11 application.

Appellate review is generally limited to those issues that have been properly preserved and presented for review. *Hodge v. Craig*, 382 S.W.3d 325, 334-35 (Tenn. 2012). Accordingly, appellate courts may decline to consider issues that have not been raised in accordance with the applicable rules. *See State ex rel. D'Amore v. Melton*, 186 Tenn. 548, 550, 212 S.W.2d 375, 376 (1948). Enforcing these requirements enables appellate courts to be "more confident in the results of their deliberations" because "they have heard the issues argued by attorneys [who] are duty-bound to fully develop their opposing positions." *State v. Northern*, 262 S.W.3d 741, 766 (Tenn. 2008) (Holder, J., concurring and dissenting).

Mr. Bishop did not raise the *Gerstein* issue in the trial court. He did not brief or argue this issue to the Court of Criminal Appeals. Neither he nor the State identified the *Gerstein* question as an issue in the Tenn. R. App. P. 11 application or in the answer to the Tenn. R. App. P. 11 application. Finally, Mr. Bishop did not identify *Gerstein* as an independent issue in the brief he filed in this Court, even though he cited *Gerstein* and *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991), in the argument section of his brief. Based on this record, we can reach no conclusion other than that Mr. Bishop waived his opportunity to take issue with the alleged delay in providing him a *Gerstein* hearing by failing to raise it and preserve it in the proper manner.

## C.

Despite Mr. Bishop's obvious waiver of the *Gerstein* issue, the Court of Criminal Appeals decided, on its own motion and without requesting additional briefing or argument, to base its decision, at least in part, on *Gerstein*. Without employing a plain error analysis, the Court of Criminal Appeals concluded that Mr. Bishop's arrest had been for an illegal

---

[8]Mr. Bishop asserted that his arrest was illegal because (1) the police lacked probable cause to arrest him, (2) the arrest was for an illegal purpose, and (3) the 48-hour detention was void.

purpose because the police detained Mr. Bishop after he was arrested "for the purpose of gathering additional evidence to justify the arrest." *State v. Bishop*, 2012 WL 938969, at *8.[9]

In criminal cases, the doctrine of plain error permits appellate courts to consider issues that were not raised in the trial court. Tenn. R. App. P. 36(b), the codification of the plain error doctrine,[10] states in part that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." We have cautioned, however, that the discretionary authority to invoke the plain error doctrine should be "sparingly exercised," *State v. Bledsoe*, 226 S.W.3d at 354, because "appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbitrators of legal questions presented and argued by the parties before them." *State v. Northern*, 262 S.W.3d at 766 (Holder, J., concurring and dissenting) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983)).

The Court of Criminal Appeals itself provided much of the substance of Tennessee's version of the plain error doctrine. In 1994, the court identified the five essential ingredients of a successful plain error claim. These ingredients are: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim.

---

[9]If the Memphis Police Department is, in fact, arresting suspects without probable cause and using this 48-hour hold procedure to gather "additional evidence to justify the arrest," this procedure clearly runs afoul of *County of Riverside v. McLaughlin*, 500 U.S. at 56. Such a practice would be unconstitutional, even if limited to 48 hours or less. *See Dunaway v. New York*, 442 U.S. 200, 214-16 (1979) (finding "investigatory detentions" not based on probable cause to be unconstitutional); *Norris v. Lester*, ___ F. App'x ___, ___, 2013 WL 4516081, at *9 (6th Cir. Aug. 26, 2013) (granting habeas corpus relief to a defendant whose probable cause hearing was delayed beyond 48 hours when there was evidence the Memphis Police Department detained the suspect to gather additional evidence and there was no alternative explanation for the prolonged detention); *Rhodes v. Lauderdale Cnty.*, No. 2:10-cv-02068-JPM-dkv, 2012 WL 4434722 at *11-12 (W.D. Tenn. Sept. 24, 2012) (granting an injunction and awarding damages under 42 U.S.C. § 1983 based on the Sheriff of Lauderdale County's use of "48-hour holds" without probable cause). Our Court of Criminal Appeals has condemned the practice in the past, *State v. Rush*, No. W2005-02809-CCA-R3-CD, 2006 WL 2884457, at *1 n.2 (Tenn. Crim. App. Oct. 11, 2006) (No Tenn. R. App. P. 11 application filed); *State v. Ficklin*, No. W2000-01534-CCA-R3-CD, 2001 WL 1011470, at *8-10 (Tenn. Crim. App. Aug. 27, 2001) (No Tenn. R. App. P. 11 application filed), and we echo that court's concerns. *See also* Steven J. Mulroy, *"Hold" On: The Remarkably Resilient, Constitutionally Dubious 48-Hour Hold*, 63 Case W. Res. L. Rev. 815 (2013) (criticizing the procedure, but also collecting news reports stating that the Memphis Police have discontinued the practice).

[10]*State v. Bledsoe*, 226 S.W.3d at 354; *Waters v. Farr*, 291 S.W.3d 873, 919 n.22 (Tenn. 2009) (Koch, J., concurring in part and dissenting in part).

App. 1994).  In addition, the Court of Criminal Appeals held that "the plain error must be of such a great magnitude that it probably changed the outcome of the trial."  *State v. Adkisson*, 899 S.W.2d at 642.

Six years later, this Court formally adopted the *Adkisson* standard as "a clear and meaningful standard for considering whether a trial error rises to the level of plain error in the absence of an objection."  *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000).  We have also held that plain error cannot be found unless the record establishes all of the elements of the *Adkisson* standard, *State v. Bledsoe*, 226 S.W.3d at 354; *State v. Smith*, 24 S.W.3d at 283, and that the courts need not consider all of the factors "when it is clear from the record that at least one of them cannot be satisfied," *State v. Jordan*, 325 S.W.3d 1, 58 (Tenn. 2010) (quoting *State v. Bledsoe*, 226 S.W.3d at 355).

Our reading of the record leads us to conclude that Mr. Bishop's lawyer was focused chiefly on his argument that the police lacked probable cause to arrest Mr. Bishop, rather than on whether the "48-hour hold" was obtained to enable the police to gather additional evidence to justify the arrest.  Because Mr. Bishop did not raise the latter issue at trial, neither party presented the sorts of evidence that one would have expected to be introduced on this issue.  Accordingly, the record is quite equivocal on this point.

Had Mr. Bishop asserted plain error with regard to his claim that the police improperly detained him following his arrest for the purpose of gathering additional evidence, he would have had the burden of demonstrating that he was entitled to relief.  *State v. Jordan*, 325 S.W.3d at 58.  Based on this record, we have concluded that a plain error argument would have run aground because Mr. Bishop would not have been able to demonstrate that considering the error was necessary to do substantial justice.

Mr. Bishop was arrested with probable cause.  He subsequently confessed three times to shooting Maurice Taylor.  On one of those occasions he was testifying under oath before a jury.  Under these circumstances, it is difficult to perceive how substantial justice requires the reversal of his conviction for first-degree felony murder in perpetration of an attempted aggravated robbery.

Based on this record, we have determined that the Court of Criminal Appeals erred by overlooking Mr. Bishop's waiver of the *Gerstein* issue and by failing to employ the plain error analysis when it addressed this issue.  Had the Court of Criminal Appeals employed the plain error analysis, it would have concluded, as we have, that Mr. Bishop is not entitled to relief based on this issue.

# IV.
## THE CORROBORATION OF MR. BISHOP'S CONFESSION

The State has also appealed from the decision of the Court of Criminal Appeals to vacate Mr. Bishop's convictions for attempted aggravated robbery and first-degree felony murder in perpetration of attempted aggravated robbery because the prosecution offered no evidence – other than Mr. Bishop's written confession and trial testimony – that the attempted aggravated robbery actually occurred. *State v. Bishop*, 2012 WL 938969, at \*13. In response to the State's assertion that the Court of Criminal Appeals had misconstrued the "*corpus delicti*" corroboration rule, we requested the parties to address whether we should either abandon the corroboration requirement "in light of modern criminal procedure protections," retain the traditional *corpus delicti* rule, or adopt the version of the corroboration requirement known as the "trustworthiness" standard.

The current state of the law in Tennessee on this point is unsettled. Although this Court long ago adopted the traditional *corpus delicti* rule, some Tennessee courts, including this one, have at times relied on the "trustworthiness" standard adopted by the United States Supreme Court in *Opper v. United States*, 348 U.S. 84 (1954). We have determined that Tennessee has been and should continue to follow a modified version of the "trustworthiness" standard. Applying this standard, we have concluded that the State presented sufficient evidence to corroborate Mr. Bishop's confessions to committing attempted aggravated robbery and, therefore, that the Court of Criminal Appeals erred by vacating his convictions for attempted aggravated robbery and first-degree felony murder in perpetration of attempted aggravated robbery.

## A.

One August day in 1660, seventy-year-old Englishman William Harrison of Gloucestershire went walking to a nearby village to collect rent money for his employer. When he failed to return, his wife sent his servant, John Perry, to look for him. When Mr. Perry failed to return, Mr. Harrison's son was dispatched to locate them both. The son encountered Mr. Perry and also learned that his father's hat and shirt had been found on another road, slashed and stained with blood. Mr. Harrison was assumed to be murdered, and Mr. Perry was the prime suspect. Under intense interrogation, Mr. Perry confessed that he, his mother, and his brother (also servants of Mr. Harrison) had murdered the old man for his money and had hidden the body in a swamp. But no one could find the body, and Mr. Perry's mother and brother swore they were innocent. Mr. Perry also testified that he had falsely confessed because he was insane. A jury convicted all three, and they were hanged together in 1661.

Mr. Harrison, the alleged murder victim, reappeared in 1662. He claimed that he had been abducted by pirates, transferred to a Turkish ship, and then sold into slavery. Mr. Harrison recounted how he had stowed away on a ship to Portugal after his master died and how he had found his way back to England. The persons responsible for executing the Perry family were understandably chagrined by this turn of events. The story became publicly known as "The Campden Wonder," and is notorious among lawyers as *Perry's Case*, 14 Howell. St. Tr. 1312 (1661).[11]

Something similar happened in America. In May 1812, Russel Colvin disappeared from his home in Manchester, Vermont. As years went by, people became convinced that he had been murdered. Mr. Colvin's brothers-in-law, Stephen and Jesse Boorn, had disliked him, and they became suspects in his apparent death. In 1819, some bones (mistakenly identified as human) were found near the Boorns' home. Jesse was arrested, and he claimed that Stephen was the killer. During his interrogation, police told Stephen that the evidence against him was overwhelming, and that to avoid the death penalty he had to confess. He did. Based on Stephen's confession, the jury convicted both brothers. Stephen was condemned to hang.

Stephen Boorn's attorney, imagining that Mr. Colvin might still be alive somewhere, disseminated a newspaper advertisement seeking his whereabouts. A man from New York responded to the advertisement and described a deranged fellow he had met who matched the advertisement's description. The man in question denied being Mr. Colvin, but Mr. Colvin's associates and relatives instantly recognized him. Days before Stephen Boorn's planned execution, the Boorn brothers were granted a new trial. *See Trial of Stephen and Jesse Boorn for the murder of Russel Colvin, Bennington, Vermont, 1819*, 6 Am. St. Trials 73 (John D. Lawson ed., 1916); David A. Moran, *In Defense of the Corpus Delicti Rule*, 64 Ohio St. L. J. 817, 829-30 (2003).

The heavily-publicized case of Russel Colvin contributed to the American courts' widespread adoption of the rule that a defendant cannot be convicted on the basis of an uncorroborated confession. Professor Simon Greenleaf, in the first volume of his influential *Treatise on the Law of Evidence* § 214, at 243 (12th ed. 1866) ["Greenleaf"],[12] recounted Mr. Colvin's case to support the proposition that "evidence of verbal confessions of guilt is to be *received with great caution*." To this end, Professor Greenleaf endorsed what is known as

_____

[11]*See* The Campden Wonder, http://www.campdenwonder.plus.com (last visited Feb. 25, 2014) (collecting and commenting on the earliest sources for the story).

[12]*Available at* http://archive.org/stream/cu31924020130153.

the traditional *corpus delicti* rule.[13]  Greenleaf, § 217, at 246-47.  Professor Greenleaf's contemporary Francis Wharton also noted the American courts' "growing unwillingness to rest convictions on confessions alone." Francis Wharton, *A Treatise of The Law of Evidence in Criminal Issues* 313 (3d ed. 1855).[14]

One longstanding general rule of criminal procedure is that the State must prove the following three elements in order to convict a defendant: (1) that a loss or injury occurred; (2) that the injury resulted from a criminal act; and (3) that the defendant was responsible for the criminal act.[15]  The Latin term "*corpus deliciti*" refers to the "body of the crime," and the body of the crime is traditionally understood to include the first two of these three elements.

The traditional *corpus delicti* rule requires the State to present evidence – independent of the defendant's confession – demonstrating the first two elements, i.e., that the alleged injury actually occurred and that the injury resulted from some person's criminal act.  The *corpus delicti* rule does not require corroboration of the defendant's identity as the perpetrator.  *See State v. Mauchley*, 2003 UT 10 ¶ 16, 67 P.3d 477, 482 (Utah 2003); *State v. Parker*, 337 S.E.2d 487, 492-93 (N.C. 1985); Kenneth S. Broun, 1 *McCormick on Evidence* § 146, at 810 (7th ed. 2013).  Additionally, the *corpus delicti* rule does not require the State to produce independent evidence related to every statutory element of the crime.  *See United States v. Trombley*, 733 F.2d 35, 37 (6th Cir. 1984); *People v. LaRosa*, 2013 CO 2 ¶¶ 34-35, 293 P.3d 567, 575-76 (Colo. 2013), *reh'g denied* (Feb. 11, 2013).  The State need only corroborate the existence of the core injury associated with the crime, plus the fact that the injury did not occur accidentally or innocently.  *See Miller v. State*, 843 A.2d 803, 830 (Md. 2004); 1 *McCormick on Evidence* § 146, at 810-11.  Many states require only "slight" or minimal corroboration – the corroborating evidence need not prove the *corpus delicti*

---

[13]In his 1678 treatise, *Pleas of the Crown*, Matthew Hale recounts two other cases that are often cited in the *corpus delicti* context.  While these cases did not involve confessions, and hence do not invoke the *corpus delicti* rule, they do illustrate his proposal, never adopted by the common law, that courts should "never convict any person of murder or manslaughter unless the facts were proved to be done or at least the body found dead."  Both cases involved people convicted of murdering victims who had actually run away, and who later reappeared.  Hale concludes the discussion with a Latin phrase to the effect that it is always safer to err on the side of mercy rather than on the side of punishment.  2 Hale *Pleas of the Crown* 290-91 (1678), *available at* http://books.google.com/books?id=gB4eAAAAMAAJ.

[14]*Available at* http://archive.org/stream/evidenceincrimin02whar#page/n7/mode/Zup.

[15]Two aspects of the contemporary legal landscape augment this traditional rule.  First, all modern crimes are statutory, and due process requires the State to prove every statutory element of a crime beyond a reasonable doubt.  *See Fiore v. White*, 531 U.S. 225, 228-29 (2001); *Jackson v. Virginia,* 443 U.S. 307, 319 (1979).  Hence, modern appellate opinions typically focus on the statutory elements of the crime rather than the three traditional general elements, although these still remain relevant.  Second, many modern crimes do not require a tangible loss or injury and thus are exceptions to the first traditional element.

beyond a reasonable doubt. *See, e.g.*, 1 *McCormick on Evidence* § 146, at 809; *State v. Smith*, 24 S.W.3d 274, 281 (Tenn. 2000).

Extrajudicial confessions are more suspect than admissions made at trial because they face "neither the compulsion of the oath nor the test of cross-examination." *Opper v. United States*, 348 U.S. at 90. Accordingly, "[a]ny statement made by the defendant in court can serve as corroboration for an extrajudicial confession." Thomas A. Mullen, *Rule Without Reason: Requiring Independent Proof of the Corpus Delicti As a Condition of Admitting an Extrajudicial Confession*, 27 U.S.F. L. Rev. 385, 408 (1993) ("Mullen"). Thus, even Professor Greenleaf, an early proponent of the *corpus delicti* requirement, declared it to be a "universal rule" that

> [confessions made] before the magistrate, or in court, in the due course of legal proceedings . . . [are] sufficient to found a conviction, even if to be followed by sentence of death, they being deliberately made, under the deepest solemnities, with the advice of counsel, and the protecting caution and oversight of the judge.

Greenleaf, § 216, at 245.

When the crime in question is a felony murder, the *corpus delicti* of the crime is the crime-induced death of the victim, not the underlying or predicate felony. For example, when a defendant confesses to felony murder in the course of a robbery, the *corpus delicti* rule requires the State to provide independent corroboration that a non-accidental death occurred, not that a robbery occurred. In the felony-murder case of *State v. Shepherd*, 902 S.W.2d 895, 901 (Tenn. 1995), this Court established that "[t]he corpus delicti in a homicide case . . . . consists of two (2) elements: (1) the death of a human being and (2) criminal agency in producing that death." *See also Hall v. State*, 206 S.W.3d 830, 835 (Ark. 2005) ("[S]o long as the *corpus delicti* of the homicide (i.e., death caused by a criminal agency) is established by independent evidence, the predicate felony may be shown by confession alone."); *Ashby v. State*, 124 Tenn. 684, 698-99, 139 S.W. 872, 875 (1911) ("[T]he corpus delicti . . . in homicide cases [is] the death of a human being, and criminal agency in producing that death.").

The Court of Criminal Appeals has applied this rule in other Tennessee felony murder cases. *See, e.g., State v. Williams*, No. W2001-00452-CCA-R3-CD, 2002 WL 1482695, at *4 (Tenn. Crim. App. Mar. 15, 2002), *perm. app. denied* (Tenn. Sept. 23, 2002); *State v. Lyons*, No. 01C01-9901-CR-00021, 2000 WL 218131, at *6 (Tenn. Crim. App. Feb. 25, 2000), *perm. app. denied* (Tenn. Oct. 23, 2000). On occasion, however, the Court of Criminal Appeals has departed from the *Shepherd* rule by requiring corroboration of the

predicate felony as part of the *corpus delicti* of felony murder. *See, e.g.*, *State v. Bishop*, 2012 WL 938969, at *13; *State v. Wagner*, No. M2010-00992-CCA-R3CD, 2011 WL 2893098, at *5 (Tenn. Crim. App. July 20, 2011), *rev'd*, 382 S.W.3d 289 (Tenn. 2012); *State v. Bough*, No. E2002-00717-CCA-R3CD, 2004 WL 50798, at *13 (Tenn. Crim. App. Jan. 12, 2004) *aff'd in part, rev'd in part*, 152 S.W.3d 453 (Tenn. 2004).

We continue to agree with the *Shepherd* rule that the *corpus delicti* of a felony murder does not include the predicate felony. The *Shepherd* rule is the majority position among American courts. *See McArthur v. State*, 793 So. 2d 1190, 1194-95 & nn.4 & 5 (Fla. Dist. Ct. App. 2001) (collecting cases representative of both versions of the felony-murder corpus delicti rule); 1 *McCormick on Evidence* § 146, at 811 (advocating for the minority rule but acknowledging that "[m]ost courts . . . have held that the corroborating evidence need not tend to prove the predicate felony."). Courts that follow the majority rule do so for reasons that we also find compelling.

Courts created the *corpus delicti* rule to alleviate their fear of convicting people for non-existent crimes, particularly homicides. *See Commonwealth. v. Leamer*, 295 A.2d 272, 275 (Pa. 1972). To accomplish this modest purpose, the rule focuses solely on the core harm associated with the crime, not the crime's statutory elements. *See United States v. Trombley*, 733 F.2d at 37; *People v. LaRosa*, 293 P.3d at 575-76 ("[T]he corroboration requirement is not an elemental test . . . . [I]t does not require the court to review the evidence as it relates to the specific elements of the crime."); 1 *McCormick on Evidence* § 146, at 810-11. The core harm that a felony murder prosecution seeks to punish is the death of victim. Without the death, there is no murder.

Courts that follow this majority rule also often reason that the predicate felony is an element that affects the degree or seriousness of the crime, rather than an aspect of the "essential harm underlying the offense." *McArthur v. State*, 793 So. 2d at 1194; *see also* 1 *McCormick on Evidence* § 146, at 811. Thus, the predicate-felony element of first-degree felony murder is analogous to the element of premeditation in first-degree premeditated murder. While the existence of these elements enhance the seriousness of the crime, they do not define the core harm. *See Gentry v. State*, 416 So. 2d 650, 652-53 (Miss. 1982); *People v. Lytton*, 178 N.E. 290, 292 (N.Y. 1931) (Cardozo, C.J.). When the State introduces independent evidence that a death has occurred by means other than accident or suicide, the defendant's confession may suffice to establish the identity of the perpetrator and the degree of severity of the crime. *Commonwealth v. Weeden*, 322 A.2d 343, 347-48 (Pa. 1974).

The majority rule is also consistent with cases that upheld inconsistent verdicts when the defendant was convicted of one crime in a multi-count indictment but acquitted of one or more other crimes from the indictment, even if the crimes for which the defendant was acquitted appeared to be necessary elements of the crime of conviction. *See Wiggins v. State*,

498 S.W.2d 92, 93-94 (Tenn. 1973) ("Consistency in verdicts for multiple count indictments is unnecessary as each count is a separate indictment."); *Dunn v. United States*, 284 U.S. 390, 393-94 (1932). Our Court of Criminal Appeals has applied this principle to cases in which a defendant was convicted of first-degree felony murder but acquitted of the predicate felony. *See, e.g.*, *State v. Grogger*, No. M2008-02015-CCA-R3-CD, 2009 WL 3832921, at *14 (Tenn. Crim. App. Nov. 17, 2009), *perm. app. denied* (Tenn. Apr. 14, 2010); *State v. Walker*, No. 02C01-9704-CC-00147, 1997 WL 746433, at *3 (Tenn. Crim. App. Dec. 3, 1997), *perm. app. denied* (Tenn. Sept. 21, 1998). Just as "[t]his Court will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned," *Wiggins v. State*, 498 S.W.2d at 94, in the context of applying the corroboration rule to a felony murder conviction, this Court will not require the State to provide independent corroboration of the predicate felony so long as the State provides independent corroboration of the non-accidental death of the victim.[16]

We have also held for almost a century that proving the *corpus delicti* of a homicide requires identifying the alleged victim:

> The evidence to establish the corpus delicti in cases of homicide must show that the life of a human being has been taken, which question involves the subordinate inquiry as to the identity of the person charged to have been killed; but the corpus delicti may be proved by circumstantial evidence, especially where that is the best proof obtainable.

*Bolden v. State*, 140 Tenn. 118, 120, 203 S.W. 755, 755 (1918); *see also State v. Thomas*, 158 S.W.3d 361, 393 (Tenn. 2005); *State v. Ogbeiwi*, No. W2010-00117-CCA-R3CD, 2011 WL 3276188, at *14 (Tenn. Crim. App. July 29, 2011), *perm. app. denied* (Tenn. Nov. 15, 2011).

Although American courts almost unanimously followed the *corpus delicti* rule for many years, in the twentieth century some legal scholars and judges began criticizing the rule as outdated and a potential obstacle to achieving justice. *See, e.g.*, 1 *McCormick on Evidence* §§ 147-48, at 813-17; Mullen, 27 U.S.F. L. Rev. at 418. First, the rule has been criticized for its inherent limitation – it does not guard against innocent persons confessing to actual crimes that were committed by someone else. *See State v. Mauchley*, 67 P.3d at 483-84 (describing the rule as "ill-suited" to detecting false confessions because the rule "focuses solely on whether a crime occurred instead of on whether a confession was true or false");

---

[16]In cases like this one, in which the defendant is tried for both the felony murder and the predicate felony, the corroboration requirement applies individually to both charges.

Mullen, 27 U.S.F. L. Rev. at 418 (stating that "[t]he rule does nothing to protect the mentally ill defendant who falsely confesses to an actual crime").

Second, critics point out that the *corpus delicti* rule has the potential to obstruct justice because it could prevent the prosecution of crimes that result in no tangible injury or which appear to be just as likely the result of accident as of criminal malfeasance. *See People v. LaRosa*, 293 P.3d at 574-75; *State v. Mauchley*, 67 P.3d at 484-85 (providing inappropriate sexual contact with a young child as an example of the former and infant homicide by suffocation as an example of the latter).

Third, critics contend that the revolution in criminal procedure that occurred in the 1960s obviates the need to corroborate confessions. Because police are now forbidden from using overtly intimidating interrogation techniques, because suspects now have the right to counsel during interrogation, and because the State now has to prove the voluntariness of confessions, critics argue that false confessions – especially confessions to nonexistent crimes – have become extremely rare. Thus, critics argue, the rule has outlived its usefulness and serves only to impede the prosecution of criminals whose crimes are difficult to corroborate. *See State v. Mauchley*, 67 P.3d at 485-87 (citing, *inter alia*, *Brown v. Mississippi*, 297 U.S. 278, 286-87 (1936) (excluding confessions elicited by physical force or duress); *Miranda v. Arizona*, 384 U.S. 436, 444-45, 466 (1966) (requiring that police inform suspects of their right to remain silent and to have the assistance of counsel and forbidding police from denying a defendant access to his or her attorney during interrogation)); Mullen, 27 U.S.F. L. Rev. at 404-05 (explaining that one of the policy rationales behind the *corpus delicti* rule, the concern about involuntary confessions, has been "dissipated" by the developments in criminal procedure developed under the Warren Court).

Other criticisms of the *corpus delicti* rule focus on the fact that American criminal laws have become more numerous and complex, and it is sometimes difficult to distill a violation into a particular tangible injury. For example, inchoate crimes such as attempt and conspiracy, as well as crimes like tax evasion and child molestation, may leave behind no tangible *corpus delicti* to corroborate the defendant's confession. Although some jurisdictions treat such crimes as exceptions to the *corpus delicti* rule, other jurisdictions point to these crimes as examples of why the rule is outdated. *See State v. Mauchley*, 67 P.3d at 487-88.

Reflecting these criticisms, many American jurisdictions have abandoned the traditional *corpus delicti* rule. The United States Supreme Court largely led the way by adopting what is known as the "trustworthiness" standard in two decisions issued the same day in 1954.

The defendant in *Opper v. United States* was convicted of conspiring with a federal official to pay the official for services rendered before a federal department or agency. Although the defendant did not confess his guilt, he did make statements to FBI agents that contained "admissions of fact essential to prove the charge." The Court found that Mr. Opper's statements, while exculpatory in nature, were "of the same character as confessions and that corroboration should be required." *Opper v. United States*, 348 U.S. at 90-91. The Court then turned to consider "the extent of the corroboration of admissions necessary as a matter of law [to support] a judgment of conviction." *Opper v. United States*, 348 U.S. at 92. After noting a divergence among the federal courts, the Court decided:

> [W]e think the better rule to be that the corroborative evidence need not be sufficient, independent of the statements, to establish the corpus delicti. It is necessary, therefore, to require the Government to introduce substantial independent evidence which would tend to establish the trustworthiness of the statement. Thus, the independent evidence serves a dual function. It tends to make the admission reliable, thus corroborating it[,] while also establishing independently the other necessary elements of the offense. It is sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth. Those facts plus the other evidence besides the admission must, of course, be sufficient to find guilt beyond a reasonable doubt.

*Opper v. United States*, 348 U.S. at 93 (internal citation omitted). The United States Supreme Court found that, although the prosecution did not present independent evidence that could establish the *corpus delicti*, it did present "substantial independent evidence to establish directly the truthfulness of petitioner's admission that he paid the government employee money." *Opper v. United States*, 348 U.S. at 93-94.

The defendant in *Smith v. United States*, 348 U.S. 147 (1954), was convicted of federal income tax evasion based on information contained in his own signed financial statements. The Court cited "[t]he general rule that an accused may not be convicted on his own uncorroborated confession" and stated that the purpose of this rule was to prevent "errors in convictions based upon untrue confessions alone." *Smith v. United States*, 348 U.S. at 152-53 (citation omitted). Although the rule was based on "the experience of the courts, the police[,] and the medical profession" that people sometimes make voluntary false confessions, the Court reasoned that the application of the *corpus delicti* rule "should be scrutinized lest the restrictions it imposes surpass the dangers which gave rise to them." *Smith v. United States*, 348 U.S. at 153. The Court noted that tax evasion involves "no tangible injury which can be isolated as a corpus delicti." *Smith v. United States*, 348 U.S.

-27-

at 154. Rather than applying the traditional rule (and overturning the conviction) or finding the corroboration requirement inapplicable to crimes with no tangible injury, the Court employed a different sort of corroboration requirement: "[For] crimes in which there is no tangible corpus delicti . . . the corroborative evidence must implicate the accused in order to show that a crime has been committed." *Smith v. United States*, 348 U.S. at 154.

As in *Opper v. United States*, Mr. Smith had intended his statements to be exculpatory, but the statements became the backbone of the prosecution's case. Such statements, the Court held, "should not go uncorroborated." *Smith v. United States*, 348 U.S. at 155. The "quantum of corroboration necessary" to establish the crime, the Court said, "does not have to prove the offense beyond a reasonable doubt, or even by a preponderance, as long as there is substantial independent evidence that the offense has been committed, and the evidence as a whole proves beyond a reasonable doubt that [the] defendant is guilty." *Smith v. United States*, 348 U.S. at 156. The Court concluded:

> All elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense "through" the statements of the accused. Under the above standard the Government may provide the necessary corroborat[i]on by introducing substantial evidence, apart from petitioner's admissions, tending to show that petitioner willfully understated his taxable income.

*Smith v. United States*, 348 U.S. at 156-57 (citation omitted). In Mr. Smith's case, "sufficient corroboration was shown to permit the case to go to the jury." *Smith v. United States*, 348 U.S. at 159.

At least twelve states and the District of Columbia have followed the lead of the federal courts by adopting the "trustworthiness" standard.[17] As the Supreme Court of Colorado has recently explained:

---

[17]*Jacinth v. State*, 593 P.2d 263, 266 (Alaska 1979); *People v. LaRosa*, 293 P.3d at 575-78; *State v. Hafford*, 746 A.2d 150, 174 (Conn. 2000); *Harrison v. United States*, 281 A.2d 222, 224-25 (D.C. 1971); *State v. Yoshida*, 354 P.2d 986, 990–92 (Haw. 1960); *State v. Heiges*, 806 N.W.2d 1, 13 (Minn. 2011); *State v. True*, 316 N.W.2d 623, 625 (Neb. 1982); *State v. Zysk*, 465 A.2d 480, 483 (N.H. 1983); *State v. Parker*, 337 S.E.2d 487, 495 (N.C. 1985); *Stout v. State*, 693 P.2d 617, 622 (Okla. Crim. App. 1984), *cert. denied sub. nom. Stout v. Oklahoma*, 472 U.S. 1022 (1985); *State v. Osborne*, 516 S.E.2d 201, 203-05 (S.C. 1999); *State v. Mauchley*, 67 P.3d at 488; *Holt v. State*, 117 N.W.2d 626, 633 (Wis. 1962), *cert. denied sub nom. Holt v. Wisconsin*, 374 U.S. 844 (1963). Idaho has gone so far as to abandon the *corpus delicti* rule altogether. *See State v. Suriner*, 294 P.3d 1093, 1098-1100 (Idaho 2013).

> The trustworthiness standard is more effective than the corpus delicti rule . . . : it seeks to detect false confessions by focusing on whether a confession is true or false. The trustworthiness standard also responds to the criticisms of the corpus delicti rule. It is easier to apply to complex or inchoate crimes because the corpus delicti does not have to be defined, and it is less likely to work injustice in cases where no evidence of the corpus delicti exists. Finally, the trustworthiness standard is not duplicative of *Miranda* and similar constitutional safeguards because it protects defendants from false confessions, not involuntary ones.

*People v. LaRosa*, 293 P.3d at 577 (citations omitted).

The essence of the trustworthiness standard has been well stated by the Supreme Court of Utah:

> Under the trustworthiness standard, the State must still establish all elements of the offense. However, the elements may be established by independent evidence of the crime, a corroborated confession, or a combination of both. Thus, the State does not have to provide independent evidence that a harm or injury occurred by criminal act before a confession may be admitted to help establish guilt.
>
> Before it can introduce a defendant's confession, however, the State must introduce substantial independent evidence which would tend to establish the trustworthiness of the confession. Stated differently, the independent evidence must strengthen and add weight or credibility to the confession, so as to produce a confidence in the truth of the confession. Hence, the precept still stands that no defendant can be convicted solely on the basis of an uncorroborated out-of-court confession.

*State v. Mauchley*, 67 P.3d at 488 (internal citations, alterations, and quotation marks omitted).

Not all states have abandoned the traditional *corpus delicti* rule. *See* David A. Moran, *In Defense of the Corpus Delicti Rule*, 64 Ohio St. L.J. 817, 817 (2003). The rule is codified

in some states.[18]  Five states in which the rule is court-made have declined to replace the traditional *corpus delicti* rule with the trustworthiness standard.[19]  One state formally adopted the traditional *corpus delicti* rule as recently as 1984.[20]

While critics bemoan the traditional *corpus delicti* rule's potential to thwart the conviction of actual criminals, Professor Moran counters that the risk of false convictions in the absence of the rule presents a greater threat.  Moran, 64 Ohio St. L.J. at 838-42 (noting the "fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free" (quoting *In re Winship*, 397 U.S. 358, 372 (1970) (Harlan, J., concurring))).  Scholars have documented hundreds of modern cases in which defendants confessed to crimes they almost certainly did not commit.  *See* Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. Rev. 891 (2004) (analyzing "125 recent cases . . . in which indisputably innocent individuals confessed to crimes they did not commit"); Richard A. Leo & Richard J. Ofshe, *Missing the Forest for the Trees: A Response to Paul Cassell's "Balanced Approach" to the False Confession Problem*, 74 Denv. U. L. Rev. 1135, 1137 n.12, 1139 (1997); Moran, 64 Ohio St. L. J. at 839 ("What cannot be denied . . . is that false confessions are regularly admitted into evidence and regularly lead to wrongful convictions.").

Another argument in support of retaining the corroboration requirement is that the rule promotes better law enforcement practices by encouraging police to conduct an independent investigation rather than rely solely on defendants' confessions.  *See* Mullen, 27 U.S.F. L. Rev. at 405-06.  Indeed, this consideration prompted the State to encourage us not to abandon the corroboration requirement altogether.  In addition, Professor Moran argues that the modern constitutional confession doctrines, such as Due Process voluntariness and the *Miranda* rules, provide little protection to the class of persons the corroboration rule was originally designed to protect – mentally ill persons who confess to fictitious crimes, such as the servant in *Perry's Case*.  Moran, 64 Ohio St. L.J. at 842-51.

---

[18]*See* Minn. Stat. Ann. § 634.03 (West 2009) ("A confession of the defendant shall not be sufficient to warrant conviction without evidence that the offense charged has been committed . . . ."); Mont. Code Ann. § 45-5-111 (2011) ("In a homicide trial, before an extrajudicial confession may be admitted into evidence, the state must introduce independent evidence tending to establish the death and the fact that the death was caused by a criminal agency."); *State v. Gould*, 704 P.2d 20, 30-31 (Mont. 1985).

[19]*Ex parte Slaton*, 680 So. 2d 909, 924-25 (Ala. 1996), *cert. denied sub nom. Slaton v. Alabama*, 519 U.S. 1079 (1997); *State v. Carwise*, 846 So. 2d 1145 (Fla. 2003) (per curiam); *Willoughby v. State*, 552 N.E.2d 462, 466 (Ind. 1990) (citing *Jones v. State*, 252 N.E.2d 572, 578-80 (Ind. 1969)); *People v. McMahan*, 548 N.W.2d 199, 201 (Mich. 1996); *State v. Dow*, 227 P.3d 1278, 1282 (Wash. 2010); *State v. Aten*, 927 P.2d 210, 222 (Wash. 1996).

[20]*Commonwealth v. Forde*, 466 N.E.2d 510, 513 (Mass. 1984).

Balancing the strengths and weaknesses of the traditional *corpus delicti* rule and the trustworthiness standard, New Jersey and New Mexico have adopted a compromise rule they call the "modified trustworthiness" standard. Under this standard, an extrajudicial confession or admission can support a conviction if the State introduces independent evidence that supports the trustworthiness of the confession, plus evidence that the harm or injury occurred. *See State v. Reddish*, 859 A.2d 1173, 1211-12 (N.J. 2004); *State v. Lucas*, 152 A.2d 50, 60 (N.J. 1959); *State v. Wilson*, 2011-NMSC-001, ¶¶ 8-16, 248 P.3d 315, 319-21, *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, ¶ 37, 275 P.3d 110, 121 n.6; *State v. Weisser*, 2007-NMCA-015, ¶¶ 17-25, 150 P.3d 1043, 1048-50. When the crime is of a type that does not result in a tangible injury, "the corroborative evidence must implicate the accused." *United States v. Brown*, 617 F.3d 857, 862-63 (6th Cir. 2010); *see also Smith v. United States*, 348 U.S. at 153-54. We will return to these standards after we discuss the development of the corroboration requirement in Tennessee.

**B.**

The *corpus delicti* rule has a long history in Tennessee; however, it has not always been accurately described. As early as 1844, this Court overturned a conviction for horse stealing based on the lack of proof at trial that the horse in question had actually been stolen. *Tyner v. State*, 24 Tenn. (5 Hum.) 383, 385 (1844). Similarly, in *Younkins v. State*, 42 Tenn. (2 Cold.) 219, 221-22 (1865), this Court reversed the defendant's conviction for stealing a hog on *corpus delicti* grounds when the State failed to call the owner of the allegedly pilfered pig or present any other evidence that the pig, found partially skinned in a field, had been stolen. In *Williams v. State*, 80 Tenn. 211 (1883), this Court, citing Wharton's treatise on criminal law and Greenlee's treatise on evidence, stated the rule:

> A confession when the *corpus delicti* is not otherwise proved, will not sustain a conviction. But when the *corpus delicti* is proved by other evidence, a free and voluntary confession, deliberately made, is, at common law, sufficient to sustain a conviction . . . . [T]he jury must have corroborating circumstances before they can convict upon a confession of guilt.

*Williams v. State*, 80 Tenn. at 212-14. Applying this rule, this Court in *Williams* found that the defendant's confession to causing a train wreck was sufficiently corroborated by physical evidence of sabotage that happened to match the defendant's description of the crime. *Williams v. State*, 80 Tenn. at 212-13. Each of these cases involves a traditional understanding of the *corpus delicti* rule and describes the issue as one of sufficiency to support a conviction.

In later cases, this Court observed that some independent evidence of the *corpus delicti* should be introduced before admitting the defendant's confession into evidence, "[b]ut if the wrong order be followed . . . it is not reversible error." *Ashby v. State*, 124 Tenn. 684, 698-99, 139 S.W. 872, 875 (1911);[21] *see also Kyle v. State*, 208 Tenn. 170, 173, 344 S.W.2d 537, 538 (1961) ("[We held in *Ashby v. State* that] it was not necessary that this evidence of a *corpus delicti* precede the introduction of the confession though it was best to do so; but if it came in the wrong order the Court would not reverse.").

In *Ricketts v. State*, this Court addressed the amount of evidence necessary to corroborate a confession:

> It seems to us that when there is a written confession that the corroborative evidence . . . need not be as convincing as the evidence necessary to establish a corpus delicti in the absence of any confession. This evidence [may be] sufficient . . . although the evidence is slight, and entitled, when standing by itself, to but little consideration. Thus when [a verdict is] founded on slight evidence of corroboration . . . it cannot be said, as a matter of law, that the verdict is contrary to the evidence.[22]

*Ricketts v. State*, 192 Tenn. 649, 654-55, 241 S.W.2d 604, 606 (1951). Although the United States Supreme Court adopted the trustworthiness standard in its *Opper* and *Smith* decisions in 1954, our opinions continued to cite the traditional rule for the remainder of the twentieth century.

Seven years ago, this Court adopted the "trustworthiness" standard without much fanfare. *State v. Housler*, 193 S.W.3d 476, 489-91 (Tenn. 2006). A jury convicted Mr. Housler of four counts of felony murder in the perpetration of especially aggravated robbery,

---

[21] The defendant in *Ashby* confessed to killing his wife, then igniting her bed. This Court found sufficient corroboration of the murder in the facts that the hair attached to a fragment of the wife's smashed skull was "matted with blood," a hammer was found under her side of the bed, and the coal oil can was found in the bedroom, when it was normally stored in the kitchen. Mr. Ashby was later hanged. *Ashby v. State*, 124 Tenn. at 704-06, 139 S.W. at 877.

[22] In *Ricketts*, this Court erroneously stated that the corroborating evidence must "tend[] to connect the defendant with the commission of the offense." *Ricketts v. State*, 192 Tenn. at 654, 241 S.W.2d at 606. However, as we later explained, "[t]he proof of the [defendant's] agency as the doer of the crime, while an essential requisite in order to convict, does not form a part of the *corpus delicti*." *Kyle v. State*, 208 Tenn. at 174, 344 S.W.2d at 538; *see also State v. Banks*, 271 S.W.3d 90, 140 (Tenn. 2008); *McClary v. State*, 211 Tenn. 46, 56, 362 S.W.2d 450, 454 (1962) ("The proof of [the defendant's] connection with this crime as the operating agent, although essential for his conviction, is not a part of the *corpus delicti*.").

largely on the basis of his written confession. While Mr. Housler's statement contained a number of details the police knew were false, he nevertheless incriminated himself as an accomplice to Courtney Matthews when Mr. Matthews killed four Taco Bell employees during a robbery. *State v. Housler*, 193 S.W.3d at 484. We considered two questions in our analysis of Mr. Housler's confession – whether Mr. Housler's confession was given voluntarily, and whether it was "minimally corroborated as required by *Opper* [and *Smith*]." *State v. Housler*, 193 S.W.3d at 489. This Court was careful to note that voluntariness affects the *admissibility* of a confession, while lack of corroboration of a confession affects the *sufficiency* of the evidence to convict. *State v. Housler*, 193 S.W.3d at 490 (citing *Smith v. United States*, 348 U.S. at 152).

After summarizing our previous *corpus delicti* holdings, we noted that "one available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused." *State v. Housler*, 193 S.W.3d at 490-91 (quoting *Smith v. United States*, 348 U.S. at 156). In Mr. Housler's case, other witnesses corroborated Mr. Housler's statements regarding his earlier meetings with Mr. Matthews and details of Mr. Housler's description of the crime scene. Although the fact that four murders had occurred was never disputed (and thus the true *corpus delicti* of the crime was not at issue), our analysis focused on whether Mr. Housler's statements connecting him to the crime had been sufficiently "bolster[ed]" by independent evidence. We held that they had been. *State v. Housler*, 193 S.W.3d at 490-91.[23]

Since 1986, all three divisions of the Court of Criminal Appeals have occasionally relied on the trustworthiness standard of *Opper v. United States* and *Smith v. United States*. For example, in *State v. Ervin*, the intermediate appellate court stated:

---

[23]*State v. Housler* can also be read to identify the *corpus delicti* rule as an aspect of constitutional due process. *State v. Housler*, 193 S.W.3d at 490 ("Due Process is violated when the jury convicts on the basis of the defendant's confession absent corroborating evidence of the corpus delicti."). The *corpus delicti* rule is a judge-made rule of American common law. We are aware of no court that derives the rule from the United States Constitution or a state constitution. *See People v. LaRosa*, 293 P.3d at 575 ("[T]he corroboration requirement is not constitutionally mandated but requires the prosecution to present corroborating evidence of a defendant's confession to assuage our long-standing concern about false confessions."); *State v. Suriner*, 294 P.3d at 1099 ("The *corpus delicti* rule does not protect any statutory or constitutional rights."); *State v. Dow*, 227 P.3d 1278, 1280 (Wash. 2010) ("[The corpus delicti rule] is judicially created and not constitutionally mandated. . . . [It] does not have a constitutional source." (quoting *City of Bremerton v. Corbett*, 723 P.2d 1135, 1139 (Wash. 1986)); Mullen, 27 U.S.F. L. Rev at 387 ("No court has ever held that the rule is constitutionally grounded."). We read *Housler* as simply supporting the uncontroversial concept that due process requires that a criminal conviction be premised on proof of guilt beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 316-18 (1979); *In re Winship*, 397 U.S. at 364.

> The United States Supreme Court has held that a conviction resting primarily upon the defendant's inculpatory statements must be affirmed where there is substantial independent evidence tending to establish the trustworthiness of the defendant's statements. The corroborative evidence which tends to prove the truthfulness of the defendant's statements need not be sufficient to establish the *corpus delicti* of the offense charged.

*State v. Ervin*, 731 S.W.2d 70, 72 (Tenn. Crim. App. 1986) (citing *Opper v. United States*, 348 U.S. at 93), *perm. app. denied* (Tenn. Apr. 6, 1987). Ten years later, citing *Ervin* and *Opper*, the intermediate appellate court again said: "A conviction resting primarily on the inculpatory statements of the accused must be affirmed where the record contains 'substantial independent evidence tending to establish the trustworthiness of the defendant's statements.'" *State v. Woodruff*, No. 01C01-9507-CR-00217, 1996 WL 429167, at *7 (Tenn. Crim. App. Aug. 1, 1996) (quoting *State v. Ervin*, 731 S.W.2d at 72), *perm. app. denied* (Tenn. Jan. 27, 1997); *cf. State v. Carter*, No. 02C01-9504-CR-00100, 1996 WL 417669, at *2 (Tenn. Crim. App. July 26, 1996) (containing virtually identical language) (No Tenn. R. App. P. 11 application filed). *See also State v. Rush*, No. M2009-02253-CCA-R3-CD, 2010 WL 4868086, at *5 (Tenn. Crim. App. Nov. 29, 2010) ("[T]he United States Supreme Court has instructed that, '[a]ll elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense 'through' the statements of the accused.'" (quoting *Smith v. United States*, 348 U.S. at 156)), *perm. app. denied* (Tenn. Apr. 13, 2011); *State v. Yaugher*, No. 03C01-9509-CC-00286, 1997 WL 618194, at *6 (Tenn. Crim. App. Oct. 7, 1997) ("The corroborative evidence which tends to prove the truthfulness of the defendant's statements need not be sufficient to establish the *corpus delicti* of the offense charged." (quoting *State v. Ervin*, 731 S.W.2d at 72)), *perm. app. denied* (Tenn. Oct. 5, 1998); *State v. Walker*, No. 03C01-9402-CR-00073, 1994 WL 617262, at *4 (Tenn. Crim. App. Nov. 9, 1994) ("A conviction resting primarily on appellant's inculpatory statements must be affirmed where the record contains 'substantial independent evidence tending to establish the trustworthiness of the appellant's statements.'" (quoting *State v. Ervin*, 731 S.W.2d at 72)), *perm. app. denied* (Tenn. Feb. 6, 1995).[24]

## C.

Against this background, we asked the parties to specifically address which formulation of the corroboration requirement should control future cases in Tennessee.

---

[24]In total, fifteen opinions of the Court of Criminal Appeals cite *Opper* or *Smith*, but most do not explicitly reference the "trustworthiness" version of the *corpus delicti* rule that these two cases established.

Neither party has asked us to abandon the corroboration requirement altogether. Mr. Bishop suggests we should hew to the traditional *corpus delicti* rule. The State suggests we clarify that the trustworthiness standard is the law in Tennessee. We agree clarification of the standard is in order.

At the outset, we agree with the United States Supreme Court that requiring independent corroboration of confessions promotes more thorough criminal investigations:

> We have learned the lesson of history, ancient and modern, that a system of criminal law enforcement which comes to depend on the "confession" will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation.

*Escobedo v. Illinois*, 378 U.S. 478, 488-89 (1964) (footnotes omitted). Accordingly, we have determined that the most appropriate approach to assuring the credibility of extrajudicial confessions is the modified trustworthiness standard adopted by New Jersey and New Mexico.[25] Adopting this approach also clarifies existing Tennessee law in the wake of several decisions from this Court and the Court of Criminal Appeals that rely simultaneously on aspects of the trustworthiness standard and the traditional rule. *See, e.g., State v. Housler*, 193 S.W.3d at 489-91; *State v. Dozier*, No. M2009-01515-CCA-R3-CD, 2010 WL 4296666, at *22-23 (Tenn. Crim. App. Oct. 29, 2010), *perm. app. denied* (Tenn. Mar. 9, 2011); *State v. Woodruff*, 1996 WL 429167, at *7; *State v. Ervin*, 731 S.W.2d at 71-72.

We have determined that the modified trustworthiness standard strikes the proper balance. It combines the traditional *corpus delicti* rule's focus on avoiding prosecutions for nonexistent crimes with the trustworthiness standard's focus on avoiding prosecutions based on false confessions to actual crimes. Under the modified trustworthiness standard, a defendant's extrajudicial confession is sufficient to support a conviction only if the State introduces "independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury." *State v. Lucas*, 152 A.2d at 60.[26] When the crime is of a type that does not result

---

[25] Although the federal corroboration doctrine is not binding on state courts, we note that United States Supreme Court precedent may also require independent proof of loss or injury (for crimes that result in a tangible injury) in addition to evidence bolstering the trustworthiness of a confession or admission. *See Wong Sun v. United States*, 371 U.S. 471, 489-90 & n.15 (1963); *cf. United States v. Lopez-Alvarez*, 970 F.2d 583, 591-92 (9th Cir. 1992) (articulating a "two-pronged approach" that attempts to harmonize *Opper* with the dicta in *Wong Sun* footnote 15).

[26] *See also State v. Reddish*, 859 A.2d at 1211; *State v. Wilson*, 2011-NMSC-001, ¶¶ 8-16, 248 P.3d

(continued...)

in a tangible injury, "the corroborative evidence must implicate the accused in order to show that a crime has been committed." *Smith v. United States*, 348 U.S. at 154; *United States v. Brown*, 617 F.3d at 862-63.

The modified trustworthiness standard is not a lesser standard than the traditional *corpus delicti* rule. Its focus is different. While the traditional rule required only "slight" evidence of the *corpus delicti*, the trustworthiness standard requires "substantial" independent evidence to bolster a defendant's extrajudicial confession or admission. *Opper v. United States*, 348 U.S. at 93; *Smith v. United States*, 348 U.S. at 157. Because the focus of the modified trustworthiness standard is different, the following guidelines will help the bench and bar apply this standard in future cases.

Here is the "modified trustworthiness" corroboration test in a nutshell.[27] When a defendant challenges the admission of his extrajudicial confession on lack-of-corroboration grounds, the trial court should begin by asking whether the charged offense is one that involves a tangible injury.[28] If the answer is yes, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, plus independent prima facie evidence that the injury actually occurred. If the answer is no, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, and the evidence must link the defendant to the crime.[29]

---

[26](...continued)
315, 319-21, *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, ¶ 37, 275 P.3d 110, 121 n.6; *State v. Weisser*, 2007-NMCA-015, ¶¶ 17-18, 24, 150 P.3d 1043, 1048-50 ("[A]n extrajudicial statement may be used to establish the corpus delicti where the statement is shown to be trustworthy and where there is some independent evidence to confirm the existence of the alleged loss or injury.").

[27]*See State v. Hardy*, 2012-NMCA-005, ¶ 10, 268 P.3d 1278, 1282 (N.M. Ct. App. 2011), *cert. granted*, 291 P.3d 599 (N.M. 2012), *and cert. quashed*, 299 P.3d 423 (N.M. 2012) (describing the modified trustworthiness analysis as a two-step process).

[28]Crimes that lack a tangible injury may include inchoate crimes, certain financial crimes, status crimes, and sex offenses lacking physical evidence and a victim who can testify.

[29]*See Smith v. United States*, 348 U.S. at 153-54 (noting that because the crime of tax evasion results in no tangible injury, the corroborating evidence must "implicate the accused in order to show that a crime has been committed"); *United States v. Brown*, 617 F.3d at 862-63 (explaining that when the confessed crime involves physical damage to person or property, the State must corroborate only that the injury occurred, but when the confessed crime results in no tangible injury, "the corroborative evidence must implicate the accused").

When the crime involves a tangible injury, the State must present independent prima facie evidence[30] that the loss or injury actually occurred. Unlike the traditional *corpus delicti* rule, the State is not required to demonstrate that the injury resulted from someone's criminal act. Nor must the State link the defendant to the injury. *See State v. Lucas*, 152 A.2d at 60.

Whether or not the charged offense involved a tangible injury, the corroboration rule requires the State to introduce substantial independent evidence[31] that the defendant's confession is trustworthy.[32] To establish trustworthiness, the State's independent evidence must corroborate essential facts contained in the defendant's statement.[33] For example, independent corroboration of one key part of an extrajudicial confession or admission may corroborate the entire statement. *See United States v. Brown*, 617 F.3d at 863 (finding that a defendant's confession concerning a robbery established the trustworthiness of another part of his confession that identified the defendant as a felon in possession of a firearm). A trustworthy confession may, of course, include multiple crimes.

Independent evidence that corroborates collateral circumstances surrounding the confession will not suffice to establish trustworthiness. For example, in *State v. Weisser*, Jeffrey Weisser told his girlfriend that God had afflicted him with Huntington's Disease to punish him for molesting a child. *State v. Weisser*, 150 P.3d at 1045. In the prosecution for child molestation, the State presented evidence that Mr. Weisser had Huntington's Disease to corroborate his admission. The court held that establishing that Mr. Weisser had

---

[30]"Prima facie evidence" may be defined as "[e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced." *Black's Law Dictionary* 638-39 (9th ed. 2009); *see also Ashby v. State*, 124 Tenn. at 698-99, 139 S.W. at 875 (suggesting that courts should determine whether "prima facie" evidence of corroboration exists before admitting a defendant's extrajudicial confession as trial evidence).

[31]"Substantial evidence" may be defined as "[e]vidence that a reasonable mind could accept as adequate to support a conclusion; evidence beyond a scintilla." *Black's Law Dictionary* 640 (9th ed. 2009).

[32]Evidence relevant to establishing the trustworthiness of an extrajudicial confession or admission may include: facts that corroborate important facts contained in the confession; facts that establish the crime which corroborate facts contained in the confession; or facts under which the confession was made that show that the confession is trustworthy or reliable. *People v. LaRosa*, 293 P.3d at 578.

[33]The independent corroborating evidence does not – by itself – "have to prove the offense beyond a reasonable doubt, or even by a preponderance." *Smith v. United States*, 348 U.S. at 156. Nor must the independent evidence prove "each element of the offense charged." The aim of the corroborating evidence is merely "to ensure the reliability of the confession or admission of the accused." *United States v. Trombley*, 733 F.2d at 37; *see also People v. LaRosa*, 293 P.3d at 575-76 ("[T]he corroboration requirement is not an elemental test . . . . [I]t does not require the court to review the evidence as it relates to the specific elements of the crime.").

Huntington's Disease did nothing to bolster the trustworthiness of his admission because his disease was purely a "collateral fact." *State v. Weisser*, 150 P.3d at 1051-52; *see also State v. Hardy*, 268 P.3d at 1281 ("[T]he facts to which a defendant confesses, not their circumstantial matrix, require independent corroboration."); *State v. Parker*, 337 S.E.2d 487, 495 (N.C. 1985) (noting that "[c]orroboration of insignificant facts or those unrelated to the commission of the crime" will not [usually] suffice).

One way the State can effectively bolster the defendant's admission or confession is to present independent evidence that "parallel[s] the defendant's confession" or corroborates the defendant's account of what happened immediately before or after the crime. *See State v. Weisser*, 150 P.3d at 1051-52 (citing *United States v. Lee*, 315 F. Supp. 2d 1038, 1044-45 (D. Ariz. 2003)); *State v. Parker*, 337 S.E.2d at 495. In this regard, the Utah Supreme Court has noted that "the degree of 'fit between the specifics of a confession and the crime facts' is critical because the 'fit' determines whether a confession should be deemed trustworthy." *State v. Mauchley*, 67 P.3d at 489 (quoting Richard A. Leo & Richard J. Ofshe, *Criminal Law: The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation*, 88 J. Crim. L. & Criminology 429, 438 (1998)).

Another way the State can bolster an extrajudicial admission or confession is by presenting evidence showing that the defendant's statement reveals "specific personal knowledge about the crime." *State v. Mauchley*, 67 P.3d at 489. This sort of personal knowledge can take the form of (1) information provided by the defendant that leads to the discovery of evidence unknown to the police, (2) information about "highly unusual elements of the crime that have not been made public," or (3) information providing "an accurate description of the mundane details of the crime scene which are not easily guessed and have not been reported publicly" and which are not "the result of suggestion by the police." *State v. Mauchley*, 67 P.3d at 489 (alterations and citations omitted).

In cases where the crime results in no tangible loss or injury, the State may be able to bolster the trustworthiness of the confession by presenting "evidence as to the spontaneity of the statement; the absence of deception, trick, threats, or promises to obtain the statement; the defendant's positive physical and mental condition, including age, education, and experience; and the presence of an attorney when the statement is given." *State v. Mauchley*, 67 P.3d at 489. If a confession is found to be trustworthy and it clearly identifies the confessor as the one who committed the crime, then this can be sufficient to "implicate the accused" in crimes that lack a tangible injury.

Two final points should be made. First, once the State presents independent evidence establishing the prima facie trustworthiness of the defendant's extrajudicial confession, the existence of contradictory evidence does not necessarily render the confession untrustworthy.

Instead, contradictory evidence raises a credibility issue to be resolved by the factfinder. *See State v. Reddish*, 859 A.2d at 1212.

Second, additional extrajudicial confessions by the defendant are not sufficient by themselves to establish trustworthiness. *See State v. Owelicio*, 2011-NMCA-091, ¶ 29, 263 P.3d 305, 312 (N.M. Ct. App. 2011), *cert. granted*, 269 P.3d 904 (N.M. 2011), *and cert. quashed*, 297 P.3d 333 (N.M. 2012); *State v. Weisser*, 150 P.3d at 1051 (citing cases that find additional extrajudicial confessions valueless and cases that find additional extrajudicial confessions relevant but insufficient by themselves). A statement made under oath in open court, however, requires no independent corroboration. An infrajudicial statement can therefore serve as corroboration for an extrajudicial one. *See* 7 John H. Wigmore, *Evidence* § 2071, at 524 (Chadbourn Rev. 1978) ("Wigmore") ("[The corroboration requirement] has of course no bearing upon an *infrajudicial confession*, which is in effect a plea of guilty.").

In Tennessee, the rule still stands that a person cannot be convicted solely on the basis of an uncorroborated extrajudicial confession. But Tennessee no longer adheres to the traditional *corpus delicti* rule. Instead, Tennessee courts should assess corroboration of an extrajudicial confession using the framework of the modified trustworthiness standard described in this opinion.

## D.

We now apply the modified trustworthiness standard to the evidence in this case. Mr. Bishop argues that the State failed to corroborate his statements that he attempted to rob Maurice Taylor. He also argues that not only his conviction for attempted aggravated robbery but also his first-degree murder conviction must be overturned because the attempted aggravated robbery conviction is the predicate felony conviction for the first-degree murder conviction.

In general, challenges concerning the sufficiency of the evidence require reviewing courts to

> determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, on appeal a defendant bears the burden of showing why the evidence is insufficient to support the conviction. This Court affords the State the strongest legitimate view of the evidence presented at

> trial and the reasonable and legitimate inferences that may be
> drawn from the evidence.

*State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (citations omitted); *see also State v. Banks*, 271 S.W.3d at 137-38.

The question of whether an extrajudicial confession is adequately corroborated is a mixed question of law and fact that appellate courts will review de novo. To the extent that the corroboration challenge rests on disputed facts, appellate courts should presume that the trial court's resolution of factual disputes is correct, unless the evidence preponderates against those findings. *State v. Weisser*, 150 P.3d at 1045. In this case, the corroboration requirement (as applied to Mr. Bishop's confession) was not litigated before trial. Accordingly, our review will focus exclusively on the evidence offered at trial.

The Court of Criminal Appeals found that "the defendant's testimony alone" provided the only evidence at trial that Mr. Bishop went to the victim's house for the purpose of robbing him and that this testimony "cannot, standing alone, support a finding that a robbery was attempted." *State v. Bishop*, 2012 WL 938969, at *13. Our examination of the record leads us to conclude otherwise.

We noted earlier that the corroboration rule applies only to extrajudicial confessions. *Opper v. United States*, 348 U.S. at 90; Mullen, 27 U.S.F. L. Rev. at 408. Thus, when Mr. Bishop testified under oath at trial and repeated the essential facts of his confession, these statements were not extrajudicial. A sworn statement made in court provides a sufficient basis for conviction beyond a reasonable doubt. Greenleaf, § 216, at 245; 7 Wigmore, § 2071, at 524. Therefore, giving the State the strongest legitimate view of the evidence at trial, a reasonable jury could have found Mr. Bishop guilty beyond a reasonable doubt of attempted aggravated robbery and murder committed in perpetration of an attempted aggravated robbery based on his testimony in court.

Had Mr. Bishop not testified at trial, his extrajudicial confession would still have been sufficient to support a conviction for attempted aggravated robbery and felony murder in perpetration of attempted aggravated robbery. In this case, we have both a crime with a tangible injury (felony murder) and a crime without a tangible injury (attempted aggravated robbery). The felony murder indictment requires both a trustworthy confession and independent prima facie evidence of the injury. The "loss or injury" at issue in a felony murder is not the predicate felony, but rather the death that occurred during the commission of the felony. *See State v. Banks*, 271 S.W.3d at 140 n.32; *State v. Shepherd*, 902 S.W.2d 895, 901 (Tenn. 1995); 1 *McCormick on Evidence* § 146, at 811 & n.16. Thus, to satisfy the modified trustworthiness standard, the State was required to (1) corroborate the fact that someone died and (2) establish the trustworthiness of Mr. Bishop's confession. The standard

does not require independent corroboration of every element of the crime. *United States v. Trombley*, 733 F.2d at 37; *People v. LaRosa*, 293 P.3d at 575-76.

Concerning the felony murder, the State clearly established that the injury occurred. The fact that the victim died was undisputed, and Maurice Taylor's body with a single fatal gunshot wound provided ample independent evidence of a loss or injury. The identity of the victim was likewise undisputed.

Had Mr. Bishop not repeated his confession in court (thereby obviating the need to corroborate his extrajudicial confession), the record demonstrates that the State comfortably cleared the hurdle of establishing the trustworthiness of the confession through substantial independent evidence. At trial, the State's witnesses established that a light-colored Mercury Cougar with tinted windows was circling the block before Mr. Taylor's murder, and that two African-American males, one of whom was Mr. McKay, later fled the scene in the same car. The State also presented independent evidence concerning the type of gun used in the crime, the fact that Maurice Taylor dealt drugs, and the amount of cash found on Maurice Taylor. This evidence corroborates Mr. Bishop's description of the events immediately preceding and following the shooting, as well as Mr. Bishop's confessed motive.

The most likely explanation for Mr. Bishop's knowledge of these details is that he was present when the crime was committed. In other words, the State presented significant independent evidence that corroborated Mr. Bishop's description of the events immediately preceding and following the killing of Maurice Taylor. *See State v. Weisser*, 150 P.3d at 1051-52 (explaining that trustworthiness can be established when the State's evidence "parallel[s] the defendant's confession" or corroborates the defendant's account of what happened immediately before or after the crime (citing *State v. Parker*, 337 S.E.2d at 495-96)).

Alternatively, the State presented evidence demonstrating that Mr. Bishop had "specific personal knowledge about the crime[s]." The State corroborated Mr. Bishop's "accurate description of the mundane details of the crime scene," including facts about the automobile, the weapon, the drug money, and the phone calls. The evidence the State offered at trial demonstrated a high degree of "fit" between the facts in Mr. Bishop's statement and the facts about the crime that the police knew through other sources. The specificity and "fit" of the corroborated facts in Mr. Bishop's confession linked Mr. Bishop personally to the crimes to which he confessed. *See State v. Mauchley*, 67 P.3d at 489. Even if Mr. Bishop had not repeated his confession in court, the independent evidence presented at trial strongly suggested that the entire extrajudicial confession he gave police was generally trustworthy. His confession also clearly implicated him in both crimes.

Because Mr. Bishop's extrajudicial confession was trustworthy, and because it directly implicated Mr. Bishop as the perpetrator, it was sufficient to support a conviction for attempted aggravated robbery. Because the victim's death and identity – the *corpus delicti* for a homicide – were proven, and because his confession was trustworthy, Mr. Bishop's extrajudicial confession was sufficient to support his conviction for felony murder.

We have considered de novo whether Mr. Bishop's confession was sufficiently corroborated to support his convictions. Because Mr. Bishop repeated his confession during his sworn testimony at trial, no corroboration was required. Giving the State the strongest legitimate view of the evidence, we conclude that a reasonable jury could have found Mr. Bishop guilty beyond a reasonable doubt of attempted aggravated robbery and felony murder committed in perpetration of attempted aggravated robbery.

## V.

In summary, we hold that the police had probable cause when they arrested Mr. Bishop. Because Mr. Bishop repeated his admission to the aggravated robbery at trial, his confession is not subject to the corroboration requirement. Had Mr. Bishop not repeated his confession at trial, the State presented sufficient evidence that the victim's death occurred and that Mr. Bishop's self-inculpatory extrajudicial confession was trustworthy. Accordingly, we reverse the judgment of the Court of Criminal Appeals and reinstate Mr. Bishop's convictions for attempted aggravated robbery and first-degree felony murder. We also assess the costs of this appeal to the State of Tennessee.

_____
WILLIAM C. KOCH, JR., JUSTICE