IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 5, 2014

**STATE OF TENNESSEE v. TERRANCE MCCRACKEN**

**Appeal from the Criminal Court for Shelby County**
**No. 11-03083    James M. Lammey, Jr., Judge**

**No. W2013-01396-CCA-R3-CD  - Filed September 10, 2014**

Appellant was convicted of rape, a Class B felony, and sentenced to nine years in confinement.  On appeal, appellant argues (1) that the trial court erred by failing to grant his motion to suppress because there was an unreasonable delay in the judicial determination of probable cause; (2) that the trial erred by failing to grant his motion to suppress because his statements to police were involuntary; and (3) that there was insufficient evidence to support his conviction.  Following our review of the parties' briefs, the record, and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ALAN E. GLENN, J., joined.

Stephen C. Bush, District Public Defender; and Phyllis L. Aluko (on appeal) and Jennifer Case (at trial), Assistant District Public Defenders, Memphis, Tennessee, for the appellant, Terrance McCracken.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Amy P. Weirich, District Attorney General; and Cavett Osner and Abby Wallace, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case concerns the rape of the victim after appellant entered her Shelby County home under the guise of using her telephone.  Appellant was indicted for aggravated rape and aggravated kidnapping.  The jury found him guilty of the lesser-included offense of rape and not guilty of aggravated kidnapping.

## I. Facts

### A. Facts from Suppression Hearing

The trial court held a suppression hearing on July 5, 2012. Kerby Windless, an officer with the Memphis Police Department, testified that on October 12, 2010, he responded to a forcible rape call. He stated that when he arrived, the victim[1] told him that appellant had become upset when her telephone rang and that he had held a knife to her throat and made her perform oral sex. She then explained that appellant was inside her home attempting to kill himself. Officer Windless observed "some redness around [the victim's] throat and forehead." Officer Windless and several other officers entered the home and saw appellant stabbing himself with a knife. Officer Windless ordered appellant to drop the knife, which he did. Appellant was then taken to receive medical attention in the responding ambulance.

During cross-examination, Officer Windless conceded that the call he heard on the radio was regarding a suicide rather than a forcible rape, describing it as an "armed party call." The incident occurred in Foote Homes in Shelby County. Between four and six officers responded to the scene, and they all arrived at approximately the same time. Officer Windless stated that the victim did not tell him she had been smoking crack cocaine and that she did not appear as if she had been so doing. Officer Windless described the victim as being "emotional," "hysterical," and "in distress" when he arrived at her home. When the officers went upstairs, appellant had several cut wounds in the center of his chest, which were bleeding, and he appeared upset. Officer Windless arrested appellant at 12:22 p.m. The officers did not gather any information at the scene indicating the occupants had used narcotics. Officer Windless stated that he was at the crime scene for approximately thirty minutes and that he completed his crime scene report while other officers transported appellant.

In response to the court's questions regarding the sequence of events, Officer Windless clarified that when they arrived,

> [appellant] was in the house. He got upset due to [the victim] had a phone call from another male and he got upset. That he got a knife, took it to her throat. She pretty much tried to wrestle the knife out of his hand but he overpowered her. And then she performed oral sex in fear of her life and then at that time[,] he became upset because he couldn't get an arousal . . . .

---

[1] It is the policy of this court to protect the identity of victims of rape; therefore, we will refer to the victim only as "the victim" throughout this opinion.

Sergeant Melvin Amerson, Jr., an investigator with the Memphis Sex Crimes Bureau, testified that on October 12, 2010, he interviewed the victim at 4:10 p.m. The victim told Sergeant Amerson that after appellant came over, he became angry and began choking her. Appellant requested fellatio, which the victim refused, and a fight ensued. The victim also stated that appellant attempted to kill himself. Sergeant Amerson described the victim's injuries, stating that the victim "had some markings in the neck area and forehead and face area and on her arms were [sic] marked up pretty good." Following the interview, Sergeant Amerson interviewed appellant at 7:30 p.m. Sergeant Amerson explained that he advised appellant of his *Miranda* rights and reviewed those rights with appellant in writing and verbally. Sergeant Amerson testified that appellant did not seem to have a problem understanding why he was there or what was occurring. On his advice of rights document, appellant indicated that he understood his rights and wished to speak with law enforcement, initialed beside his affirmative answers, and signed the document. Appellant then confessed to using a knife to force the victim to perform oral sex. After taking appellant's statement, Sergeant Amerson obtained a forty-eight-hour hold while he attempted to contact the sex crimes prosecutor. Sergeant Amerson asserted that there was "most definitely" probable cause to arrest appellant at that time. In order to obtain the forty-eight-hour hold, Sergeant Amerson presented a form to the judicial commissioner stating the relevant facts, when the crime occurred, and the justification for the forty-eight-hour hold. The hold document was signed and dated October 12, 2010, at 10:12 p.m. Appellant was formally charged the following day after officers spoke with the prosecutor and canvassed the crime scene area.

During cross-examination, Sergeant Amerson stated that appellant was free to leave the police station until the forty-eight-hour hold was issued; however, Sergeant Amerson stated that appellant was in custody during his interview, which occurred prior to obtaining the forty-eight-hour hold. Sergeant Amerson conceded that he was not present at the crime scene and, therefore, did not know whether appellant was placed in handcuffs at the scene. Sergeant Amerson first saw appellant when appellant was sitting inside the police station. Sergeant Amerson explained that when presenting an arrestee with the advice of rights form, he allows the arrestee to read the document, he informs the arrestee of the pending charges, and then he asks the arrestee to read the document aloud. If the arrestee agrees to speak with Sergeant Amerson, the arrestee answers the questions on the form affirmatively and initials beside the responses. Sergeant Amerson described appellant's demeanor as "real calm." Appellant told Sergeant Amerson that he was thirty-five years old and had a seventh grade education. Appellant also told Sergeant Amerson that he and the victim had been smoking crack cocaine together before appellant was arrested. Sergeant Amerson did not recall appellant's saying that he suffered from a mental disability and was unaware that a caller had told dispatch that appellant was a "mental patient who was off his medications." Sergeant Amerson recalled that appellant had a bandage on his forehead and some "scratch marks." Sergeant Amerson stated that while appellant was in the police station, Sergeant Amerson

and several other officers asked appellant whether he needed any food or water and whether he needed to use the restroom.

Sergeant Amerson agreed that the purpose of the forty-eight-hour hold was to continue investigating the incident and that he and his partner went to the crime scene to canvas the area on October 13, the day following appellant's arrest. Appellant was then formally charged in this case at 4:37 p.m. on October 13. Sergeant Amerson went back to the judicial commissioner and made an affidavit of complaint, which is a statement of probable cause, against appellant.

Judicial Commissioner John Marshall testified that his core function as a judicial commissioner was to make probable cause determinations that began the "charging process." He stated that on October 12, 2010, at 10:12 p.m., he authorized a forty-eight-hour hold for appellant based on probable cause.

Appellant testified that in October 2010, he was thirty-five years old, had a seventh grade education, and had not obtained his GED. Appellant had been diagnosed with schizophrenia and prescribed Prozac and Trazodone in 2005. However, appellant had not taken his medication for "a month or two" prior to the incident involving the victim. Appellant also stated that he had been using crack cocaine for approximately eight years prior to October 2010 and that he and the victim smoked eight rocks of crack cocaine on October 12, 2010. Appellant explained that when the police arrived, he was "poking [himself] with scissors in [his] stomach" because he "felt depressed." The officers handcuffed appellant and escorted him outside. An ambulance responded to the scene and bandaged appellant's stomach, forehead, and elbow; however, appellant stated that he was not given the option to go to the hospital. Appellant asserted that one of the officers told him that he was not going to jail and that they were going to get appellant "some help." Appellant was transported to the Sex Crimes Bureau between 2:30 and 3:00 p.m. Appellant explained that he felt "very depressed," hungry, thirsty, exhausted, and sleepy. He stated that no one offered him food or water at the Sex Crimes Bureau.

Appellant stated that his interview with Investigators Amerson and Covington began at approximately 7:30 p.m. Appellant explained that although he did not want to speak with the officers, the officers asked if he wanted to "'give a statement now or tomorrow,'" and because he did not want to "go through that again," he said, "'I'll give you a statement now.'" Appellant stated, "I just didn't want to go through being starved or thirsty or scared. I had to use the bathroom once[,] and they harassed me," explaining that Sergeant Amerson threatened to throw him out of a window. Appellant asserted that Sergeant Amerson did not inform appellant of his constitutional rights before Sergeant Amerson began talking to appellant about the incident with the victim; however, appellant testified that at some point

during the interview, Sergeant Amerson provided him with a piece of paper that said he had the right to remain silent. Appellant asserted that if he had "known [his] rights," he "wouldn't have said nothing [sic]." At the end of the interview, appellant initialed and signed his statement.

During cross-examination, appellant conceded that he initialed and signed the advice of rights form and that he was advised of his *Miranda* rights. Appellant also agreed that his statement was a typewritten summary of his responses to questions during his interview.

In response to the court's questions, appellant testified that prior to this incident, he had a criminal record and stated that he "knew [his] rights . . . from watching Dragnet and stuff like that." However, appellant stated that when he was interviewed, the police did not inform him of his constitutional rights, and he was not thinking clearly. Appellant also stated that his arraignment hearing occurred on October 14, within forty-eight hours of his arrest.

Following the hearing, the court made both oral and written findings. Regarding the legality of appellant's arrest, the court determined that probable cause to arrest existed after the victim's statement to police at the scene. The court also found that Commissioner Marshall determined that probable cause had been established at 10:12 p.m., when appellant was arrested at 12:22 p.m. that same day. Fewer than ten hours elapsed between appellant's arrest and his judicial determination, and an affidavit of complaint was filed within twenty-eight hours of arrest, both of which were filed within the forty-eight-hour constitutional threshold. The trial court determined that this was not an unreasonable delay and was not done for purposes of further investigation. Therefore, the trial court found that appellant's arrest and the subsequent probable cause determinations were proper. Regarding the suppression of appellant's statement, the trial court stated that it credited Sergeant Amerson's testimony that Sergeant Amerson informed appellant of his *Miranda* rights before taking appellant's statement. The court also discredited appellant's testimony. Furthermore, the court determined that appellant was aware of his rights from his numerous past convictions and that he was free to invoke them, yet he decided not to do so. The court also determined that appellant had the mental capacity to validly waive his constitutional rights and that the waiver was voluntarily given. Therefore, the court denied appellant's motion to suppress.

B. Facts from Trial

Appellant's trial began on February 25, 2013. Officer Windless's testimony at trial was substantially similar to his suppression hearing testimony. He elaborated that he was dispatched "as an armed party that was upgraded to a possible mental consumer call," which meant someone may be having a mental health problem. After speaking with the victim,

officers entered the victim's upstairs bedroom and saw appellant stabbing himself with a "kitchen butter knife."

During cross-examination, Officer Windless stated that after he saw appellant, Officer Windless considered appellant to be a danger to himself. Appellant was placed in handcuffs for two purposes: to detain him during the investigation and for appellant's own safety. Officer Windless testified that appellant told the victim, "You don't love me," and, "Nobody loves me." The victim also told Officer Windless that appellant had initially retrieved the knife.

The victim testified that on October 12, 2010, she returned to her home to find appellant, whom she had known for two months, standing on her porch. Appellant asked to use her telephone, and the two entered her apartment. Appellant had been inside her home two or three times prior to this incident. After appellant and the victim watched television for a time, the victim received a telephone call, and she informed appellant that he needed to leave. Appellant then grabbed the victim's neck and began choking her, telling her that he was going to kill her. He threw her on her bed. A struggle ensued, and the victim retrieved a knife from beneath her pillow. The two fought over the knife, and appellant ultimately gained control of the knife. Appellant then forced the victim to perform oral sex for two to four hours. The victim stated that at one point she attempted to leave but that appellant grabbed her around the neck and forced her to return to the bed. The victim stated that during this time she was "begging for [her] life." In the end, appellant asked the victim to call the police, which she did. The victim explained that she told the 9-1-1 operator that someone was trying to kill himself rather than that someone was forcing her to perform oral sex because, in her words, "I had promised him I wasn't going to tell, and that was the reason why he had me to call the police because he was thinking I wasn't going to tell." The victim testified that when the police arrived, she told them that appellant was in the apartment trying to kill himself and that he had just raped her. The victim denied taking illegal drugs on the day in question and denied seeing appellant consume drugs at her apartment. The victim explained that after appellant was apprehended, she gave a statement at the police department and was physically examined at the Rape Crisis Center.

During cross-examination, the victim stated that appellant arrived at her home at 9:00 or 10:00 a.m. The victim explained that she had been in her bedroom for approximately twenty to thirty minutes with appellant when she received a telephone call from a male friend, who was coming to visit. The victim denied ordering or using crack cocaine with appellant and denied agreeing to perform oral sex on appellant in exchange for crack cocaine. She asserted that she had never willingly performed fellatio on appellant. The victim explained that she kept a knife under her pillow for her protection. The victim agreed that during the struggle for the knife, she and appellant both obtained cuts on their faces. The

victim conceded that prior to trial, she did not tell the police that appellant had threatened to kill her during the knife fight. The victim agreed that at her preliminary hearing, she testified that appellant held the knife either at his side or held it on his chest as he lay on her bed. She testified that appellant lay on her bed for the two to three hours during which she performed oral sex. She explained that a friend called during this time and that she "begged and pleaded" for him to come over. However, the man never arrived. After the victim finished performing fellatio, she noticed that appellant "was acting like something was wrong." Appellant called a friend, and then after the call ended, appellant asked the victim to call the police. The victim could not recall where the knife was during appellant's telephone call. The victim agreed that she told the 9-1-1 operator that appellant had not taken his medication and that appellant suffered from depression and bipolar disorder.

Sergeant Amerson's testimony was substantially similar to his testimony at the suppression hearing. Sergeant Amerson stated that he and Sergeant Covington interviewed appellant. He stated that standard operating procedure dictated that when they began interviewing appellant, they establish a rapport with appellant by asking for his name, age, and interests. However, before appellant was asked about the incident at issue, Sergeant Amerson provided appellant with a written copy of his *Miranda* rights, which appellant initialed and signed.

During his statement to police, appellant told the officers the following: Appellant went to the victim's apartment for a date. He knew the victim because his father and uncle had previously dated her. Appellant asserted that he and the victim had previously had oral sex for money and for crack cocaine. After he arrived, the victim called someone and ordered a "dime," which is a ten-dollar rock of crack cocaine, on three separate occasions. After the cocaine was delivered each time, appellant and the victim used the narcotics, and the victim performed fellatio. During this time, the victim received a telephone call from "another trick," who said he would arrive later. After the two had used the last of the crack cocaine, appellant asked the victim to perform oral sex again, which she refused. Appellant stated that he "pushed her onto the bed and held her face down into the pillow trying to make her [perform fellatio.]" The victim then retrieved a knife and cut appellant. Appellant told the victim, "'I'm not going to hurt you, I just want some more [fellatio]." The victim then performed oral sex, and appellant stated that "[e]very time that she would stop, [he] would pick the knife back up." In the end, appellant apologized to the victim, and the two continued to use crack cocaine. The victim then performed oral sex again. Appellant stated, "'Then she tried to run out of the house, but I caught her.'" Afterward, he told the victim to call the police. Appellant stated that he did not want to go to the hospital, so the police took him to the police department. Appellant told Sergeant Amerson that the victim had told him, "No," and conceded that he had "force[d] [himself] onto her."

During cross-examination, Sergeant Amerson stated that appellant was sweating and talkative during the interview and that appellant told him that he had used crack cocaine before the interview. Sergeant Amerson stated that he was unaware that appellant suffered from depression and bipolar disorder and that he was unaware appellant had not been taking his medication. Sergeant Amerson also denied threatening appellant.

Following this testimony, the jury found appellant guilty of rape. The trial court sentenced appellant to nine years in confinement.

## II. Analysis

Appellant now argues that the trial court erred by failing to grant his motion to suppress because there was an unreasonable delay in the judicial determination of probable cause, that the trial erred by failing to grant his motion to suppress because his statements to police were involuntary, and that there was insufficient evidence to support his conviction. The State responds that the trial court properly denied appellant's motion to suppress and that there was sufficient evidence to support appellant's rape conviction. We agree with the State.

## A. Motion to Suppress

A trial court's findings of fact at a hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). As the trier of fact, the trial court is in a better position to assess the witnesses' credibility, determine the weight of the evidence and the value to be afforded it, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. However, the trial court's conclusions of law are not binding on this court. *State v. Randolph*, 74 S.W.3d 330, 333 (Tenn. 2002) (citing *State v. Simpson*, 968 S.W.2d 776, 779 (Tenn. 1998)). Further, the trial court's applications of law to the facts are questions of law that we review de novo. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000) (citations omitted). On appeal, the prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn therefrom. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). The appellant bears the burden of establishing that the evidence contained in the record preponderates against the trial court's findings of fact. *Braziel v. State*, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975) (citation omitted).

1. Delay in Probable Cause Determination

Appellant argues that appellant's judicial probable cause determination was unreasonably delayed because the delay was for the purpose of gathering additional evidence and for delay's sake.

The law requires that when a person is arrested without a warrant, he or she must be brought "before a magistrate to 'seek a prompt judicial determination of probable cause.'" *State v. Bishop*, 431 S.W.3d 22, 42 (Tenn. 2014) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 125 (1975) (holding that "the Fourth Amendment requires a timely judicial determination of probable cause as a prerequisite to detention"); *see also State v. Huddleston*, 924 S.W.2d 666, 672 n.2) (Tenn. 1996). Tennessee Rule of Criminal Procedure 5(a)(1) provides that "[a]ny person arrested — except upon a capias pursuant to an indictment or presentment — shall be taken without unnecessary delay before the nearest appropriate magistrate." The Tennessee Supreme Court has recently stated that "a delay of less than forty-eight hours is presumptively reasonable" and that when the delay exceeds forty-eight hours, the State must show that "'a bona fide emergency or other extraordinary circumstance' caused the delay." *Bishop*, 431 S.W.3d at 42 (quoting *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991)). Nonetheless, even a delay of less than forty-eight hours may be unreasonable "if the delay is 'for the purpose of gathering additional evidence to justify the arrest' or if the delay is 'motivated by ill will against the arrested individual, or delay for delay's sake.'" *Id.* (quoting *McLaughlin*, 500 U.S. at 56). "Courts cannot ignore the often unavoidable delays in transporting arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest, and other practical realities." *McLaughlin*, 500 U.S. at 56-57.

The remedy for failing to bring an arrestee before a magistrate without unnecessary delay is exclusion of "any evidence obtained by virtue of a suspect's unlawful detention," unless an exception to the exclusionary rule applies. *Bishop*, 431 S.W.3d at 42 (citing *Huddleston*, 924 S.W.2d at 673-75). However, "when a suspect is arrested based on probable cause, the ensuing detention is typically not illegal until it 'ripens' into a *Gerstein* violation." *Id.* (citing *Huddleston*, 924 S.W.2d at 675). "Obviously, if [an arrestee's] statement was given prior to the time the detention ripened into a constitutional violation, it is not the product of the illegality and should not be suppressed." *Huddleston*, 924 S.W.2d at 675.

Initially, we must determine when the police had probable cause to arrest appellant. "Probable cause . . . exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are 'sufficient to warrant a prudent [person] in believing that the [defendant] had committed or

was committing an offense.'" *State v. Bridges*, 963 S.W.2d 487, 491 (Tenn. 1997) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "'Probable cause must be more than a mere suspicion.'" *State v. Echols*, 382 S.W.3d 266, 278 (Tenn. 2012) (quoting *State v. Lawrence*, 154 S.W.3d 71, 76 (Tenn. 2005)). However, "probable cause 'deal[s] with probabilities[,] . . . not technical[ities,] . . . the factual and practical considerations of everyday life on which reasonable and prudent [persons] . . . act.'" *Id.* (quoting *State v. Day*, 263 S.W.3d 891, 902 (Tenn. 2008)); *see Brinegar v. United States*, 338 U.S. 160, 175 (1949). Moreover, a determination of probable cause encompasses the accumulation of information known to law enforcement collectively if a sufficient nexus of communication exists between the arresting officer and a fellow officer with pertinent knowledge. *Echols*, 382 S.W.3d at 278 (citation omitted).

In this case, the trial court determined that probable cause existed at the time of arrest, and we agree. While the police initially responded to the crime scene for a "mental consumer call," which meant someone might have been experiencing a mental health problem, upon arrival, the victim informed Officer Windless that appellant had held a knife to her throat and had forced her to perform oral sex. She then explained that appellant was inside her home attempting to kill himself. Officer Windless also observed "some redness around [the victim's] throat and forehead." Therefore, at the time of arrest, there was sufficient information to "warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'" *Bridges*, 963 S.W.2d at 491 (quoting *Beck*, 379 U.S. at 91).

Because appellant was arrested based on probable cause, the delay between his arrest and his judicial probable cause determination was "not illegal until it 'ripen[ed]' into a *Gerstein* violation." *Bishop*, 431 S.W.3d at 42 (citing *Huddleston*, 924 S.W.3d at 675). The facts show that appellant was arrested on October 12, 2010, at 12:22 p.m. His first judicial determination occurred later that same day at 10:12 p.m. after both the victim and appellant were interviewed. Appellant was then formally charged in this case at 4:37 p.m. on October 13, just over twenty-eight hours from arrest. Therefore, because the delay was less than forty-eight hours, it is presumptively reasonable. *Bishop*, 431 S.W.3d at 42 (quoting *McLaughlin*, 500 U.S. at 56).

Appellant argues that even though appellant's judicial determination was made within the forty-eight-hour window, the delay was still unreasonable because the reasons for delay were for investigative purposes and delay for delay's sake. However, appellant's argument conflates the type of investigation to establish probable cause that is prohibited according to *McLaughlin* and a continuing, ongoing investigation to prove guilt beyond a reasonable doubt for trial. A delay of less than forty-eight hours may be unreasonable "if the delay is 'for the purpose of gathering additional evidence *to justify the arrest*.'" *Id.* (emphasis added) (quoting *McLaughlin*, 500 U.S. at 56). As we have stated above, probable cause was

established at the moment of arrest; therefore, any additional evidence gathered was not collected to *justify* the arrest. Furthermore, the delay was not merely for delay's sake. The investigating officer interviewed the victim and appellant and then waited to contact the prosecuting attorney. Based on the facts presented and the law, we conclude that the delay for the investigator to interview the parties involved and contact the prosecuting attorney was reasonable; therefore, the delay never "ripened" into a *Gerstein* violation. *Bishop*, 431 S.W.3d at 42 (citing *Huddleston*, 924 S.W.2d at 675). The trial court properly denied appellant's motion to suppress. Appellant is without relief as to this issue.

## 2. Involuntary Statement

Appellant also argues that his statement to law enforcement should have been suppressed because appellant was not properly provided with his constitutional rights prior to giving his statement and because the statement was not voluntarily given.

"The Fifth Amendment to the United States Constitution provides in part that 'no person . . . shall be compelled in any criminal case to be a witness against himself.'" *State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005) (quoting U.S. Const. amend. V). "Similarly, Article I, section 9 of the Tennessee Constitution states that 'in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself.'" *Id.* (quoting Tenn. Const. art. I, § 9).

Due to "the inherently compelling pressures of in-custody interrogation," the United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966), "limited the admissibility of statements that would ordinarily meet the due process test of voluntariness" by establishing prophylactic rules designed "to permit a full opportunity to exercise the privilege against self-incrimination." *State v. Crump*, 834 S.W.2d 265, 268 (Tenn. 1992)). Any statements, "whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant" must be excluded "unless [the prosecution] demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444. These procedural safeguards require an officer to advise an accused prior to custodial interrogation or its functional equivalent

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479; *see also Rhode Island v. Innis*, 446 U.S. 291, 298 (1980); *State v. Sawyer*, 156 S.W.3d 531, 534 (Tenn. 2005).

Notwithstanding, an accused may waive his right against self-incrimination. *Thacker*, 164 S.W.3d at 248 (citing *Miranda*, 384 U.S. 436, 444 (1966)). The accused's waiver of his right against self-incrimination under *Miranda* must be made intelligently, knowingly, and voluntarily to be held constitutional. *Id.* (citing *Miranda*, 384 U.S. at 444).

> The United States Supreme Court has interpreted the Fifth Amendment in part to require that an incriminating statement or confession be freely and voluntarily given in order to be admissible. This even applies to statements obtained after the proper *Miranda* warnings have been issued. Statements and confessions not made as a result of custodial interrogations must also be voluntary to be admissible. It must not be extracted by "any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." Moreover, due process requires that confessions tendered in response to either physical or psychological coercion be suppressed. This has evolved into the "totality of circumstances" test to determine whether a confession is voluntary.

*Id.* (internal citations omitted). Thus, to determine whether an accused's statements were voluntary, the appellate courts review the totality of the circumstances surrounding the waiver of the right against self-incrimination. *Id.* at 249 (citing *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)).

Appellant first argues that he was not properly given his *Miranda* rights. Specifically, he directs this court to the exact times recorded on appellant's statement and advice of rights form to show that appellant was not provided with his constitutional rights until after his interview had begun. Appellant's statement indicates that his interview began at 7:30 p.m. Appellant's advice of rights has 7:35 p.m. written at the top of the form, indicating when the officers provided appellant with his rights. The form was signed at 7:39 p.m. Appellant argues that this provides proof that he was interviewed before the officers informed him of his rights. However, Sergeant Amerson testified that the standard operating procedure dictated that when they began interviewing appellant, they established a rapport with appellant by asking for his name, age, and interests. Sergeant Amerson explained that before appellant was asked about the incident at issue, appellant was provided with a written copy of his *Miranda* rights, which appellant initialed and signed. The trial court credited Sergeant Amerson's testimony that Sergeant Amerson informed appellant of his *Miranda* rights before taking appellant's statement. The court also discredited appellant's testimony. Furthermore, the court determined that appellant was aware of his rights from his numerous past convictions and that he was free to invoke them, yet he decided not to do so. As the trier of fact, the trial court is in a better position to assess the witnesses' credibility, determine the weight of the evidence and the value to be afforded it, and resolve any conflicts in the

evidence. *Odom*, 928 S.W.2d at 23. We will not disturb this credibility finding on appeal. Appellant has failed to show that he was not properly informed of his constitutional rights.

Appellant further argues that his statement was not voluntarily given because he was "hungry, thirsty, depressed, exhausted[,] and sleepy" and because he was "harassed when he indicated that he needed to use the bathroom." However, the trial court also discredited this testimony and credited Sergeant Amerson's testimony that multiple officers asked appellant if he needed food, water, or a restroom break. This is a credibility determination we will not disturb on appeal. *See Odom*, 928 S.W.2d at 23. The appellant has failed to establish that the evidence contained in the record preponderates against the trial court's findings of fact. *See Braziel*, 529 S.W.2d at 506 (citation omitted). Appellant is without relief as to this issue.

C. Sufficiency of the Evidence

Appellant argues that the evidence was insufficient to support appellant's rape conviction. Specifically, appellant argues that the evidence is insufficient to show that appellant's choking or throwing the victim on the bed was used to accomplish fellatio, rather than "just an eruption of anger by a mentally ill man who exhibited suicidal tendencies."

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and

resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

To sustain a conviction for rape, the State must prove beyond a reasonable doubt the "unlawful sexual penetration of a victim by the defendant [and] [f]orce or coercion [was] used to accomplish the act." Tenn. Code Ann. § 39-13-503(a)(1). Coercion "means threat of kidnapping, extortion, force or violence to be performed immediately or in the future." Tenn. Code Ann. § 39-13-501(1). Sexual penetration means "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7). Rape is a Class B felony. *Id.* § 39-13-503(b).

Viewed in the light most favorable to the State, the evidence established that appellant entered the victim's home and that appellant forced or coerced the victim to perform fellatio. The victim testified that appellant became angry after she received a telephone call, grabbed her throat, and threw her onto the bed. She stated that after a struggle, appellant gained control of a knife that she had retrieved from beneath her pillow. The victim stated that appellant then forced her to perform oral sex for two to four hours. The victim stated that at one point she attempted to leave but that appellant grabbed her around the neck and forced her to return to the bed. The victim stated that during this time she was "begging for [her] life." Appellant also admitted that he asked the victim to perform fellatio, which she refused. Appellant stated that he "pushed her onto the bed and held her face down into the pillow trying to make her [perform fellatio.]" The victim then performed oral sex, and appellant stated that "[e]very time that she would stop, [he] would pick the knife back up." Furthermore, both Officer Windless and Sergeant Amerson observed redness around the victim's throat and forehead. This information was sufficient for a reasonable jury to find beyond a reasonable doubt that appellant raped the victim.

Appellant appears to attack the victim's credibility by drawing attention to the inconsistencies between the victim's testimony at a preliminary hearing and her testimony at trial. However, in a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *Bland*, 958 S.W.2d at 659; *Pruett*, 788

S.W.2d at 561. We will not disturb the jury's credibility determinations on appeal. This issue is without merit, and appellant is not entitled to relief.

## CONCLUSION

Based on the parties' briefs, the record, and the applicable law, we affirm the judgment of the trial court.

_____
ROGER A. PAGE, JUDGE